UNITED STATES of America,
Appellee,

v.

Jerry Morris COHEN, Appellant.

No. 74–1634.

United States Court of Appeals,
Eighth Circuit.

Submitted March 12, 1975.

Decided May 28, 1975.

Murry Marks, Clayton, Mo., for appellant.

Richard Coughlin, Asst. U. S. Atty., St. Louis, Mo., for appellee.

Before GIBSON, Chief Judge, CLARK, Associate Justice,* and LAY, Circuit Judge.

Mr. Justice CLARK.

Appellant Jerry Morris Cohen was indicted on March 20, 1974, along with his son, Boyd Cohen, on 22 counts of mail fraud, 18 U.S.C. § 1341. The younger Cohen was never apprehended, and ap-

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

pellant proceeded to trial alone on July 29, 1974, in the Eastern District of Missouri. The gravamen of the Government charge was that appellant conceived, established, and operated a nationwide "rack sales" scheme to defraud, involving the use of the mails. *Cf.* United States v. Nance, 502 F.2d 615 (8th Cir. 1973). At the close of the Government's case, the district court entered a judgment of acquittal on seventeen of the counts. The defendant presented no evidence, and the jury returned a guilty verdict on the five remaining counts.

## I.

The indictment charged that appellant conducted a scheme to defraud between October 1968 and December 1970 under the name "International Sales Company" (INSCO) and subsequently between January 1971 and February 1972 under the name "United Marketing, Ltd." The principal ingredient of the scheme was the sale of dealerships for the marketing of national brand merchandise through the use of wire rack display stands to be located in areas of heavy pedestrian traffic, such as supermarkets, drug and discount stores, and other retail establishments. The alleged fraud consisted of the misrepresentation of: (1) the quality of the locations where the wire racks were to be placed; (2) the terms under which the dealerships were sold; and (3) the profits to be derived from their operation. The Government's position was that, from start to end, appellant was the guiding star of the fraud, even though a man named Sid Lyner served initially as the titular head of the operation and, later, Boyd Cohen, appellant's son, served as president during the period in which appellant was incarcerated for tax evasion. The Government emphasized that appellant, after serving his prison sentence, promptly returned to the active management of the operation, changed its name and location, and continued the identical scheme.

At trial, appellant's original partner, Sid Lyner, who testified under a grant of immunity, described the origins of INSCO. It was in the summer of 1968 that appellant approached Lyner with a proposition involving rack sales; Lyner, who wanted to get out from under an unsuccessful automobile transmission repair business, readily agreed. Soon thereafter, the pair went to a housewares show in Chicago where appellant contacted several manufacturers of national brand products with reference to the sale of their products through display racks. Upon their return to St. Louis, Missouri, Lyner and Cohen began advertising dealerships for the sale of 3–M tape products, but abandoned the plan when arrangements with the manufacturer failed to materialize.

In October of 1968, at the specific instance of appellant, INSCO was incorporated in the state of Missouri with Lyner, Lyner's wife, and appellant's wife as the original incorporators. Lyner was listed as the first president; Mrs. Cohen as the secretary-treasurer. Appellant assumed no official title in the corporation because, as he told Lyner, he feared that the Government might attach his interest in the operation in order to satisfy various income tax debts. Despite his lack of official title, appellant was the functional head of the entire operation: contacting manufacturers, preparing the sales pitch, hiring and firing company officials, and receiving the lion's share of the profits.[1]

The first step in INSCO's plan of operation[2] was to place advertisements in newspapers throughout the country, offering dealerships for sale and casting INSCO as the authorized representative

---

1. Lyner testified that in 1968, appellant was paid $300 per week, which was twice as much as the nominal president, Lyner, received. In addition, both Lyner and Cohen were advanced substantial sums of money from the company as "loans" and were furnished company automobiles.

2. As will be discussed *infra*, testimony of United Marketing, Ltd. officials and customers showed that an identical method of operation was used by appellant in setting up that company in 1971.

of the national brand manufacturers named in the advertisement. Initially these ads were prepared by appellant, but that task was turned over to his son early in 1969. In fact, INSCO was never an authorized agent or representative of these manufacturers; rather, appellant had simply made an arrangement with the manufacturers of a number of well-known products whereby the manufacturers agreed to sell to INSCO as a wholesaler and to send a prepackaged shipment of retail products and wire display racks to INSCO's customers upon receipt of cash prepayment from INSCO.[3]

As described by appellant's ads, each dealership was to consist of an inventory of prepackaged products, racks, and a "route" of varying size, up to twenty "locations" in retail outlets where the racks were to be set up. As a matter of course, when someone answered the advertisements, a form letter was sent out acknowledging the inquiry and a salesman dispatched to deliver the prepared "pitch". The key elements of the presentation were (1) that the company would provide "high traffic" locations of some 200 to 500 persons per day; (2) that the dealership would provide earnings of from $400 to $800 per month or higher; and (3) that the company guaranteed to buy back any unsold products at the end of six months (later extended to 18 months).

If after hearing the sales pitch, a prospective dealer was interested in becoming a dealer, he was told that an earnest money deposit, usually $800, would be necessary to secure the distributorship. The prospective dealer would then make out the check and fill out a form so that the company's "careful" screening of applicants could be facilitated. A letter of agreement or sales contract would be executed and submitted to the home office in St. Louis, ostensibly for screening. In fact, no credit checks or other screening

ever occurred. Once the earnest money deposit and the letter of agreement were received at the home office, another form letter would be sent out congratulating the new dealer and advising him of his approval. The letter would also remind him that the balance of his payment for the dealership—which seems to have approximated INSCO's actual cost for the prepackaged shipment—was due before any merchandise or racks would be sent. Only at that point would one of the company's "marketing engineers" be sent to secure locations in the dealer's service area; but no surveys or other marketing analyses were ever undertaken. Few, if any locations were furnished in sales areas with a daily pedestrian traffic of 200–500.

Although most of appellant's customers did eventually receive the merchandise they had paid for, in some cases they did not, particularly in late 1970, toward the end of INSCO's life. More importantly, appellant's companies failed to provide the essential part of its package: quality locations that would support its profit projections. In theory, dealers were to keep as profits all of their income from sales over the commissions charged by the retail outlets for the privilege of allowing the racks to remain on their busy premises; dealers had only to service their racks on a regular basis to reap their profits. In reality, dealers uniformly complained that the locations provided by appellant's companies did not fit the "high traffic" sales-producing descriptions contained in the advertising materials and sales pitches. Rather than the bustling supermarkets and drug stores stressed by appellant's salesmen, the locations were more typically out-of-the-way gas stations, sleepy-hollow stores, and seedy skid row establishments. In many cases, no locations at all were ever supplied. Moreover, when dealers complained, the guaranteed buy-back provision of the contract was

---

**3.** On behalf of INSCO, appellant made arrangements with the manufacturers of Arno tape products, Snapit electrical products, and, through an intermediary, LePages glue products; identical arrangements on behalf of United Marketing, Ltd., were made by appellant with the manufacturer of Ray-O-Vac batteries.

regularly observed only in the breach. When disgruntled dealers contacted INSCO, they were stalled along with promises never kept and reassurances that were never honored. Various form letters were sent out in sequence, putting off the dealers' inquiries and promising, variously, that the company would find new locations, that the dealer should be patient because the company was having internal problems, and that the company would honor the buy-back agreement. In fact, no followups were ever made to these "lulling" letters. No new locations were ever provided; no buy-backs were ever made; and, indeed, dealers who attempted to contact INSCO eventually had their letters returned unopened or found the company's phones disconnected.

In presenting its case, the Government introduced substantial evidence, including testimony of key INSCO employees—the office manager, locations manager, "sales consultants," and operations manager—as well as testimony of officials from the various manufacturers, which the jury could have credited in concluding that the entire operation from its birth to its death was controlled and inspired by appellant. Certainly INSCO was conceived, established, and personally operated by appellant from early in 1968 until his departure for prison in June of 1969. Although appellant was imprisoned on federal tax violations from that date until November of 1970, his responsibility for the operation did not end. Within four months of the time appellant began serving his tax evasion sentence, Lyner was out as president of INSCO and Boyd Cohen had taken his place. Importantly, the scheme to defraud did not change one whit.

During appellant's 18-month absence, INSCO continued its operation in the same manner under Boyd Cohen's stewardship as it had under appellant's direct control. To be sure, business decisions were made by Boyd Cohen apparently without consulting appellant, but these were relatively minor matters: a new product here, a new manager for some department there. Appellant's basic plan of operation remained in force, and its constituent parts indelibly bore his stamp. The advertising copy varied little from his initial ads; the sales pitch followed step by step that which he originally designed; the myriad form letters used to recruit, appoint and eventually "lull" dealers descended directly from his original models. It was appellant who had arranged the original agreements with manufacturers and who had selected key employees that stayed with INSCO to the end and even carried over into the new corporation, United Marketing, Ltd.

It stretches the imagination to suppose that appellant created a legitimate business organization which was subverted in his absence. Quite to the contrary, each element of fraud was planted and nurtured by appellant before his penitential sojourn. It is not unreasonable for the jury to have concluded that, upon going to prison, appellant merely designated his son—who had been in charge of advertising for some time—to replace Lyner as head of INSCO. This is borne out by the fact that the son operated the company with the same employees and the same routine between June of 1969 and appellant's return in November of 1970. Although there is no evidence that appellant operated the business from prison, he did resume command immediately when he was released.

Upon his release, appellant returned to INSCO, sent out a flurry of "lulling" letters to dissatisfied INSCO dealers, and secretly closed down the business, which was by then attracting fewer and fewer new dealers and was under investigation by federal authorities. Taking with him the office manager and locations manager of INSCO as well as most of the company's furniture, fixtures, and records, appellant established United Marketing, Ltd. It was precisely the same operation but with a new product, a new name, and a new address. Though listing himself as the president of United Marketing, Ltd., appellant often used the alias "Mr. Jerome" in corre-

spondence and in personal dealings with salesmen and dealers. A salesman who had worked for both INSCO and United Marketing, Ltd., identified the sales pitch as the same. In November of 1971, as federal authorities began to close in on United Marketing, Ltd., appellant shut down operations, but continued to send out "lulling" letters to dealers as late as February of 1972, claiming "difficulties" and requesting patience.

█ From a review of the evidence, there can be no doubt that appellant was the overseer of a continuing nationwide scheme to defraud in violation of 18 U.S.C. § 1341 which began in 1968 under the name INSCO and ended in 1972 under the name United Marketing, Ltd.

## II.

Appellant's first claim of error is that he was irretrievably prejudiced by the district court's failure to order a severance of the defendants and of those counts "which related only to Boyd Cohen." Appellant and his son were indicted on 22 counts of mail fraud. At the conclusion of the Government's case, the district court granted a judgment of acquittal on Counts II through XVIII, which related to mailings between March of 1970 and October of 1970, when appellant was in prison, and stated:

First of all, I think that the evidence fails to establish the guilt of the defendant beyond a reasonable doubt in Count II, which charges causing and then mailed [sic] a letter on April the 7th, 1970. The evidence affirmatively shows that the Defendant was not there after June 15th, 1969, up to and including November the 15th, 1970.

And the Court knows of his own knowledge that the Defendant was in the penitentiary at that time. There is no evidence that this Defendant authorized, directed, ratified or in any manner whatsoever caused the mail alleged to have been mailed in furtherance of the scheme and artifice to defraud on April 7th, 1970, was in any way caused to be mailed or placed in the mail by this Defendant.

The same is true of Count III, Count IV, Count V, Count VI, Count VII, Count VIII, Count IX, Count X, Count XI, Count XII, Count XIII, Count XIV, Count XV, Count XVI—that Richer did testify—Count XVII and Count XVIII.

Appellant argues that the Government knew or should have known that it could not adduce sufficient evidence to prove a case against him on those counts, and that the trial of Counts II through XVII was improperly joined under Rule 8(b) since there was no evidence at all that he had "participated" in the business while he was in prison and while his son, Boyd Cohen, was acting as head of INSCO. Furthermore, it is argued that failure to sever was an abuse of discretion under Rule 14 since the record contains hundreds of pages of testimony relating to Counts II through XVIII which was "irrelevant, immaterial, prejudicial, and inflammatory" as to appellant and allowed the jury "a roving commission to believe that evidence of the crimes charged in Counts II through XVIII could be used to infer a criminal disposition on the part of Jerry Morris Cohen." Finally, appellant argues that the district court should have granted a new trial at the conclusion of all the evidence, since "[i]t should have become obvious then to the trial judge that the pre-trial and in-trial representations made by the government's attorney were false and misleading." We cannot agree.

As we noted earlier, Boyd Cohen, appellant's son, was never apprehended and hence never tried. No evidence "solely relating to" him was in fact introduced at the trial of appellant Jerry Morris Cohen. On the contrary, all of the evidence applied to appellant, showing his participation in a continuous common scheme marked by multiple violations of the mail fraud statute. While we perceive no good reason for the district court to have taken the consideration of Counts II through XVIII away from the jury, as it did, we cannot see how the evidence received under these counts prejudiced the appellant, particularly in view of the jury instructions given.

■ It is now well known that the use of the mails under 18 U.S.C. § 1341 need not be personally undertaken by a defendant, but need only be "caused" by him, see United States v. Britton, 500 F.2d 1257 (8th Cir. 1974). The Supreme Court has explained this requirement in Pereira v. United States, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954), as follows:

> Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he "causes" the mails to be used.

A jury might well have concluded that appellant—in establishing an ongoing mail fraud scheme throughout the United States; in actually preparing the forms of letters, applications, and sales pitch used in the scheme; and, in addition, having selected most of the employees himself, including his son—would have reasonably foreseen, if not planned, that his son and the employees would continue the operation in his absence as they did. As Mr. Justice McKenna said long ago in Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912):

> Men may have lawful and unlawful purposes, temporary or enduring. The distinction is vital and has different consequences and incidents. The conspiracy accomplished or having a distinct period of accomplishment is different from one that is to be continuous. * * * Having joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until he does some act to disavow or defeat the purpose he is in no situation to claim the delay of the law. As the offense has not been terminated or accomplished, he is still offending. And we think, consciously offending,—offending as certainly, as we have said, as at the first moment of his confederation, and continuously through every moment of its existence.

■ Once the appellant contrived this scheme to defraud and set it in motion, he was engaged in a continuous offense of causing the mails to be used in furtherance thereof, an offense which is not mitigated by his mere physical absence. In general, proof of a mail fraud scheme involving two or more persons is analogous to the nature of proof in a conspiracy, see United States v. Grow, 394 F.2d 182, 203 (4th Cir. 1968), and the same may be said of withdrawal from a mail fraud scheme. An individual participant in a fraud scheme will be held liable for the acts of his agents and co-schemers that are within the general scope of the scheme, see United States v. Cohen, 145 F.2d 82 (2d Cir. 1944), unless as in a conspiracy, he undertakes some affirmative act of withdrawal. See Glazerman v. United States, 421 F.2d 547 (10th Cir. 1970); Reisman v. United States, 409 F.2d 789 (9th Cir. 1969); Blue v. United States, 138 F.2d 351 (6th Cir. 1943).

■■ Here, the jury could well have found that appellant intended the business to keep going in his absence and placed his son in charge of INSCO for that purpose. Therefore, the continuous recruiting and defrauding of INSCO customers between June of 1969 and November of 1970 and the consequent use of the mails were within the general scope of the scheme and would be attributable to appellant, since he never withdrew from the scheme but on the contrary resumed his personal management of it upon his release from prison. While incarceration may constitute evidence of withdrawal from a conspiracy, it is hardly conclusive and merely creates a question for the jury. See United States v. Borelli, 336 F.2d 376 (2d Cir.), cert. denied sub nom., Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1964); United States v. Agueci, 310 F.2d 817 (2d Cir. 1962).

The instant case is quite close to the situation in Reisman v. United States, 409 F.2d 789 (9th Cir. 1969), where the court commented:

> Although appellant Reisman resigned as president and director of the Gam-

ble Land Company and ceased to participate in the company's day-to-day business operations, he remained a major stockholder and took no affirmative action to disavow or defeat the promotional activities which he had joined in setting in motion. We think more was required to terminate his liability for the continuing conduct of his confederates. [409 F.2d at 793.]

Those cases which have found withdrawal from mail fraud schemes, such as Glazerman v. United States, 421 F.2d 547, 551–52 (10th Cir. 1970), and Blue v. United States, 138 F.2d 351, 362 (6th Cir. 1943), are distinguished by the minor roles in the schemes played by the defendants in those cases. In *Glazerman* and *Blue*, the courts were confronted with lower-level participants who left the fraud scheme at identifiable points, never to return. Here we are faced with the kingpin himself, who not only initiated the scheme and employed key participants, including his son, but returned after a prison sentence to preside over its metamorphosis from INSCO into a new life as United Marketing, Ltd. There was assuredly no error in the trial court's denying appellant's motion to sever Counts II through XVIII from the indictment. If anything, the district court went too far in appellant's favor by granting a judgment of acquittal on the 17 counts covering mailings while he was in prison, and we cannot say that in so doing the district court created a situation which vitiates the jury verdict.

### III.

■ Appellant next complains that the district court erred in admitting testimony regarding representations made by INSCO's salesmen to prospective dealers and complaints made by the dealers to appellant's companies. He relies on Reisman v. United States, 409 F.2d 789 (9th Cir. 1969), for the proposition that customer complaints may not be used to establish constructive notice of fraud in the absence of a showing of actual knowledge of the complaints by

the defendant. Here, appellant argues, there was no such showing, and the result is that he was severely prejudiced by this evidence. We do not think so.

Appellant's reliance on *Reisman* and its progenitor, Phillips v. United States, 356 F.2d 297 (9th Cir. 1965), is misplaced since the statements were not introduced, as they were in the Ninth Circuit cases, for the purpose of proving that the defendant *knew* that his advertising was creating a false impression in persons who might be interested in purchasing a distributorship. Rather, they were introduced to prove that the promises contained in the sales pitch, originally designed by appellant and continuously used throughout the life of INSCO and United Marketing, were *in fact* false and that there was a common scheme, organized and controlled by the appellant.

■ Appellant lays great stress on the prejudice accruing from so much evidence relating to the 17 counts on which judgment of acquittal was granted, on the theory that the district court's action rendered the totality of the evidence irrelevant as to the issue of guilt or innocence. However, we find no error in the admission of evidence regarding the 17 dismissed counts, for had the Government originally elected to indict appellant only on the five counts left standing, most all of the challenged evidence would still have been admissible. This evidence was relevant to prove that the scheme charged had a common plan originated by appellant, continued during his absence, and kept up by him on his return. Proof as to the charges contained in Count I and Counts XIX through XXII would have been confusing indeed if all narrative ligatures connecting INSCO and United Marketing, Ltd., had been omitted. Thus the proof under the 17 dismissed counts, though cumulative to some extent, was no more prejudicial to appellant than any other relevant, incriminating evidence. *See* United States v. Bessensen, 433 F.2d 861, 866 (8th Cir. 1970), cert. denied, 401 U.S. 1009, 91 S.Ct. 1254, 28 L.Ed.2d 545 (1970); Lowe v. United States, 389 F.2d 108, 112 (8th

Cir. 1968), cert. denied, 392 U.S. 912, 88 S.Ct. 2072, 20 L.Ed.2d 1371 (1968). The district court excluded the exhibits relating to Counts II through XVIII from the jury's consideration and subsequently instructed the jury as follows:

> There has been evidence of acts and statements by salesmen and others made outside the presence of the Defendant. These statements and acts may be considered as evidence as to the Defendant if you find beyond a reasonable doubt that the Defendant did formulate and participate in a scheme to defraud by use of the mails, and that the salesmen's statements and actions were in furtherance of that scheme, and that the Defendant authorized or ratified the statements and actions made by salesmen or others.

> Otherwise, any admission or incriminatory statement made or act done outside of court, by one person, may not be considered as evidence against any person who was not present and did not hear the statement made, or see the act done.

It follows that the complained-of testimony—relating to (a) the type of letters sent, (b) the sales pitch delivered, (c) the contracts entered into, (d) the failure to honor the repurchase agreement, and (e) appellant's subsequent adoption of the fraudulent misrepresentations in causing "lulling" letters to be sent to dealers secured during his absence, see United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962)—was relevant and material to issues of intent and common scheme as to Counts I and XIX through XXII. We therefore find no error in the admission of the testimony of salesmen and dealers regarding the various counts.

## IV.

Appellant next urges that corporate records of INSCO seized by a U.S. Postal Inspector from the garage area of the building housing United Marketing's offices should have been suppressed. The facts developed at the suppression hearing are these: On November 29, 1971, a federal postal inspector was notified by the arson squad of the St. Louis County police department that a fire had occurred in the basement area of 11527 Olive Street, a building which contained several offices including that of United Marketing. The fire occurred during the pendency of an investigation of INSCO's activities, and, some three weeks earlier, the postal inspector had interviewed appellant, who denied any connection with INSCO.

When the postal inspector entered the basement area where the police were conducting an investigation of the fire, he observed the charred records. Before seizing any of the records, the inspector ascertained from the building owner that they had been stored in the garage with his permission and then spoke to the Secretary-Treasurer of United Marketing, Jacquelyn Stonebraker, who was the former office manager of INSCO. She disclaimed any knowledge of the records other than to state that they were INSCO records and that they had nothing to do with United Marketing. Thereafter, after briefly examining the records to make certain that they were indeed INSCO corporate records, the postal inspector seized the boxes.

■ At trial, none of these records were introduced. Appellant, nonetheless, claims error on the theory that all further investigation following the seizure was tainted by this allegedly unconstitutional act. We do not pass upon the merits of this contention. As the district court concluded, appellant has no standing to object to the seizure of corporate records, especially where the search was not directed against him, his residence, or even his office. See Christianson v. United States, 226 F.2d 646 (8th Cir. 1955); United States v. Culver, 224 F.Supp. 419 (D.Md.1973).

## V.

■ Appellant next claims that the indictment should have been dismissed as

vague and uncertain, *see* United States v. Curtis, 506 F.2d 985 (10th Cir. 1974). In *Curtis*, the indictment alleged little more than the statutory proscription, but here the indictment was quite explicit, alleging the identities of all 22 victims, the dates of the mailings, the specific misrepresentations of the rack sales scheme, and the various product lines. There is no error in the indictment.

## VI.

Finally, appellant argues that there was insufficient evidence of his guilt to sustain his convictions on Counts I and XIX through XXII. He urges that his merchandising scheme "was theoretically sound and dealers could earn profits thereby." If it was corrupted or misrepresented, this was done by others without appellant's knowledge or consent. Viewing the evidence in the light most favorable to the Government as we must, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we think that there was more than enough evidence for the jury to conclude that appellant intentionally defrauded the named victims in Counts I and XIX through XXII. Such intent is rarely susceptible of direct proof and must be inferred from the totality of the facts and circumstances. United States v. Smallwood, 443 F.2d 535 (8th Cir.), cert. denied, 404 U.S. 853, 92 S.Ct. 95, 30 L.Ed.2d 93 (1971). Points which weigh strongly against appellant are (1) his anonymity in the corporate hierarchy at INSCO; (2) his use of the alias "Mr. Jerome" at United Marketing; (3) his cavalier attitude toward his customers and toward the guaranteed buy-back agreement when he told his subordinates not to worry about such things; (4) his complete lack of any basis for assertions of profit projections; and (5) his failure to establish any system of obtaining rack locations which could even reasonably hope to approximate the high traffic estimates his sales pitch promised.

From the outset of operations, the representations authorized by this defendant was so clearly fraudulent or, at the minimum, made and authorized with reckless indifference for the truth that it cannot be said that the verdict lacks support in the record. *See* United States v. Henderson, 446 F.2d 960 (8th Cir.), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971). The judgment is therefore affirmed.