UNITED STATES of America

v.

Francis N. ROSENBAUM.

Crim. No. 74–514.

United States District Court,
E. D. Pennsylvania.

Sept. 28, 1977.

C. Oliver Burt (former U. S. Atty.), Lansdale, Pa., Walter S. Batty, Jr., Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Francis Rosenbaum, pro se.

## OPINION

DITTER, District Judge.

Defendant, Francis N. Rosenbaum, was convicted by a jury of conspiracy, three counts of mail fraud[1] and one count of wire fraud.[2] He now moves for a new trial, arguing that his right to a fair trial was prejudiced because the jury was permitted to consider evidence of another alleged crime in reaching its verdict. For the reasons hereafter advanced, the motion must be denied.

The factual and procedural history of this case is long and complicated, and a detailed analysis is unnecessary for resolution of defendant's motion. Suffice it to say that defendants[3] were charged in a 23-count indictment with conspiring to participate in a scheme to defraud the Penn Central Transportation Company (Penn Central), its wholly owned subsidiary, American Contract Company (American Contract), and a syndicate of German banks in connection with a loan transaction in September, 1969. Defendants Bevan and Gerstnecker, as former officers of the Penn Central, were also charged with misapplication of funds of a common carrier.[4]

The evidence adduced at trial, viewed, as it must be, in a light most favorable to the government,[5] *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, reh. denied 315 U.S. 827, 62 S.Ct. 629, 86 L.Ed. 1222 (1942); *United States v. McClain,* 469 F.2d 68, 69 (3d Cir. 1972), may be briefly stated as follows. In July 1969, Francis N. Rosenbaum made arrangements with officials of the Berliner Bank, West Germany, to secure a $10 million loan, in the form of a conditional sales agreement, for Penn Central to rehabilitate worn-out railroad equipment. Mr. Rosenbaum made such contact in his capacity as a co-broker

---

1. 18 U.S.C. § 1341.

2. 18 U.S.C. § 1343.

3. Defendants were David C. Bevan, who was chairman of the finance committee and chief financial officer of the Penn Central Transportation Co. until its bankruptcy in June, 1970, William R. Gerstnecker, who was vice-president of the finance department, Joseph and Francis Rosenbaum, two Washington, D.C. lawyers who had business dealings with the railroad, and Fidel Gotz, a German financier. Mr. Gotz died before trial started.

4. 18 U.S.C. § 660, which provides in relevant part:

"Whoever, being a president, director, officer . . . of any firm, association, or corporation engaged in commerce as a common carrier, . . . embezzles, steals, abstracts, or willfully misapplies . . . any of the moneys, funds . . . of such . . corporation arising or accruing from, or used in, such commerce . . . ."

5. Since defendant has requested that his motion be treated alternatively as a motion for judgment of acquittal, this is the proper standard to apply. See Reply to Government's Memorandum in Opposition to Motion for New Trial, p. 3.

working with R. W. Pressprich & Co., Inc., a New York brokerage firm, in securing loans from European investors. Negotiations continued until September 11, 1969, at which time a meeting was held in Mr. Bevan's office in Philadelphia. At this meeting, attended by all the defendants except Mr. Gotz, Francis Rosenbaum introduced a number of documents structuring the loan transaction. This loan arrangement was unusual in two respects: First, the entire loan amount would be available once it was approved with no restriction on the use of the funds. In a typical conditional sales financing agreement, funds would be made available as the equipment was available for repair; here, only $6 million of equipment was ready to be refurbished but American Contract[6] could (and did) secure all $10 million at once. Second, one of the documents signed on behalf of Penn Central authorized the transfer of the loan proceeds to a corporation in Lichtenstein named First Financial Trust (First Financial). Although purportedly a financial institution, First Financial was not even in formal existence at that time, a fact that may not have been known to Penn Central's officials. In any event, this document instructed First Financial to hold the funds in trust and use them for investment purposes until Penn Central requested their return. The following day, September 12, 1969, Mr. Rosenbaum flew to Germany and finalized the loan arrangement.

Three days later he arrived in Vaduz, Lichtenstein and, with the aid of a local attorney, Franz Pucher, executed a series of documents creating First Financial Trust. He first acquired a Lichtenstein corporation, Finimobeil, and changed its name to First Financial.[7] He then executed a series of documents which made him the sole owner of First Financial, made his brother, Joseph Rosenbaum and himself, the sole principals who could instruct Lichtenstein agents on the handling of the corporation, and appointed Dr. Peter Marxer[8] and his law partner, Adulf Peter Goop, as the agents who would receive and execute the Rosenbaums' instructions. Once this was accomplished, Francis Rosenbaum signed a document authorizing the First Financial agents to transfer approximately $4 million to a company called Vileda Anstaldt immediately. After having satisfied Mr. Pucher that this transfer was in accordance with the wishes of American Contract and Penn Central and attesting to the accuracy of the debt, Mr. Rosenbaum signed a letter from Vileda Anstalt agreeing to the transfer. Mr. Goop, in his capacity as agent for First Financial, then signed the letter from American Contract whereby First Financial agreed to receive the $10 million loan proceeds. Mr. Rosenbaum knew that he was without authority from Penn Central in arranging for this transfer to Vileda Anstalt and that Vileda Anstalt was nothing more than one of many shell corporations owned by Fidel Gotz.

On September 18, 1969, members of Penn Central's finance department, but not Mr. Bevan or Mr. Gerstnecker, requested the Chemical Bank, Penn Central's New York bank, to transfer the loan funds to First Financial, although Penn Central or American Contract had yet to receive any indication that First Financial was agreeable to this business arrangement. This notification was not forthcoming until September 22, 1969, the same day First Financial received the money and transferred $4 million

6. One condition the German bank syndicate demanded was the issuance of a promissory note by Penn Central. But since Interstate Commerce Commission regulations prohibit the issuance of a written promissory note by a carrier in railroad financing, Penn Central structured the transaction so that American Contract, a non-carrier, could issue a note evidencing the indebtedness. In form, the loan was made payable to American Contract, American Contract would sell the equipment to Penn Central, Penn Central would pay for the equipment over a period of time while American Contract would retain title, and American Contract would assign to the bank its title in the equipment.

7. In Lichtenstein, a common practice is to retain the corporate entity once it has gone out of business. This shell can then be purchased and its name changed with relative ease.

8. Dr. Marxer was a Lichtenstein attorney for whom Franz Pucher worked.

to Vileda Anstalt. On October 23, 1969, the remaining balance was received by Penn Central.

By the spring of 1970, members of Penn Central's finance department became concerned over the status of the missing $4 million. Until that time, no additional drawdown of the funds had been requested. This matter finally came to a head in July, 1970, approximately one week after Penn Central filed for bankruptcy. At that time, an official from the Berliner Bank contacted Penn Central officials seeking the additional $4 million in loan collateral. Subsequent investigation by counsel for the Penn Central trustees, Edwin P. Rome, Esq., led him to Fidel Gotz. Gotz admitted to having secured the $4 million through Vileda Anstalt but refused to return it, claiming that Penn Central owed him the sum in reimbursement for funds he had expended on the railroad's behalf in investing in certain European airlines. This money has yet to be recovered.

At the close of the government's case, I granted motions for judgment of acquittal filed by Bevan and Gerstnecker. Thereafter, the jury found Francis Rosenbaum guilty on five counts. His brother, Joseph, was acquitted on all seven counts.[9]

## I.

Mr. Rosenbaum first argues that his right to a fair trial was prejudiced because, although Count II, the charge of misapplication, was dismissed when the motions of defendants Bevan and Gerstnecker for judgment of acquittal were granted, the jury was permitted to consider evidence relating to misapplication in reaching its verdict on the conspiracy count. He lays great stress on the fact that the government's evidence tended to prove the crime of misapplication as well as the crimes of mail fraud, wire fraud, and conspiracy. I find this argument to be without merit for at least three reasons.

First, and foremost, defendant has cited no authority for his rather novel proposition that certain evidence can not be used to establish two distinct criminal violations. Had the government originally elected to indict defendant only on those counts left standing following dismissal of the count relating to misapplication, all of the government's evidence still would have been relevant to prove that defendants engaged in a scheme to defraud the railroad and the Berliner bank. Simply because this evidence was also presented to show that defendants Bevan and Gerstnecker, due to their unique relationship with the railroad, may have misapplied Penn Central funds is no reason to hold that it was prejudicial. This evidence was no more prejudicial than any other relevant, incriminating evidence. *United States v. Cohen,* 516 F.2d 1358, 1365 (8th Cir. 1975).

Second, the effect of dismissing Count II was to remove from the jury's responsibility any consideration of misapplication. I charged that

> . . . those who can commit the crime of misapplication are only those who work for the railroad, and you can't be guilty of the crime of conspiracy to misapply the funds of the railroad by yourself. You have to conspire with someone who worked for the railroad. And since Mr. Gerstnecker and Mr. Bevan are no longer in this case, then these charges cannot be sustained in any possible way against Mr. Rosenbaum, either Mr. Francis Rosenbaum or Mr. Joseph Rosenbaum. (N.T. 19–19, 19–20).

Thus, the jury was left to consider whether the evidence presented was sufficient to establish a conspiracy to defraud and not whether the Rosenbaums had misapplied the funds.

Finally, defendant has not pointed to any specific item of the government's case which went to the crime of misapplication

---

9. Following the withdrawal and dismissal of several counts of the indictment, seven counts remained for the jury's consideration.

and which could have been considered by the jury to his prejudice. To argue that the situation was clearly prejudicial is not enough—he must show by what evidence he was harmed.

## II.

Defendant also argues that I committed error when, following the judgments of acquittal for Bevan and Gerstnecker, reference to them was not deleted from that portion of Count 1 which described the victims of the scheme. Count 1, as submitted to the jury, provided in part:

> . . . the Defendants, . . . unlawfully, willfully and knowingly combined, conspired, confederated and agreed with each other, . . . to violate Title 18, United States Code, Sections 1341, 1343, and 660, that is to use and cause to be used the facilities of the United States mails and wire communications in interstate and foreign commerce in the execution of a scheme and artifice to defraud the Berliner Bank and syndicate of German Banks, the American Contract Company, the Penn Central Transportation Company, and their respective shareholders, officers and employees (not including Defendants BEVAN and GERSTNECKER) . . .

He contends that because I did not amend the indictment to eliminate the references to Bevan and Gerstnecker, the jury was invited to think that if they were not among the officers of Penn Central defrauded, then they must have known about the scheme; therefore, the conspiracy and scheme alleged in the indictment did exist; and consequently that Rosenbaum must have conspired with Bevan and Gerstnecker. This argument must also be rejected.

■ The short and simple answer to this contention is that the jury was not permitted to find that Francis Rosenbaum conspired with Mr. Bevan and Mr. Gerstnecker. I specifically charged that under the conspiracy count that jury could find three possible conspiracies: 1) Francis Rosenbaum and Joseph Rosenbaum; 2) Francis Rosenbaum and Fidel Gotz; and 3) Joseph Rosenbaum and Fidel Gotz (N.T. 19–48). Whether the jurors believed that Francis Rosenbaum may have conspired with Mr. Bevan and Mr. Gerstnecker is of no import; in order to convict him under Count 1 they had to find either situation one, or two, or both. They were given no other option. To argue that they made or could have made the finding suggested by Mr. Rosenbaum is to contend that the jury disregarded my specific instructions to them. I will not so hold.

## III.

■ Finally, Mr. Rosenbaum argues that because he alone was found guilty of conspiracy, the only possible co-conspirator was Fidel Gotz, and the record was insufficient to establish that Mr. Gotz conspired to defraud Penn Central or the Berliner Bank. This contention is equally without merit. There was ample testimony and documentary evidence introduced to establish that when the arrangement was made to transfer the $4 million to Vileda Anstalt, Gotz knew that neither Penn Central nor the Berliner Bank had authorized these funds to be converted to his permanent use. Therefore, since testimony was introduced to establish that Gotz had admitted to having the sum and had refused to return it upon demand, it was reasonable for the jury to believe that he conspired to defraud the railroad and the lending banks.