107 F.3d 871
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
GREEN RIVER COAL COMPANY, INC. (96-5617), Clyde Brown, Jr.
(96-5618), Defendants-Appellants.
 Nos. 96-5617, 96-5618.
 United States Court of Appeals, Sixth Circuit.
 Feb. 18, 1997.
 
 Before: MERRITT, KENNEDY, and GUY, Circuit Judges.
 
 
 1
 GUY, Circuit Judge, delivered the opinion of the court in which MERRITT and KENNEDY, JJ., concurred, except as to that part of the opinion that upholds the validity of the mail fraud prosecution. KENNEDY, Circuit Judge, delivered a separate opinion with respect to the mail fraud count, in which MERRITT, Circuit Judge, joined, making Judge KENNEDY's opinion the opinion of the court as to the mail fraud count.
 
 
 2
 Defendants, Green River Coal Company, Inc. and Clyde Brown, Jr., appeal their convictions for mail fraud and Travel Act violations. See 18 U.S.C. §§ 1341, 1346, 1952; see also id. at § 2. Brown also appeals his conviction for assisting in the preparation of false tax returns, see 26 U.S.C. § 7206(2), and his sentence. Specifically, defendants allege that (1) there was insufficient evidence in the record to support their convictions; and (2) the trial court committed numerous evidentiary errors. Brown further claims that (1) his convictions were barred under the relevant statute of limitations and that his convictions violate the ex post facto clause, and (2) the court made improper enhancements in calculating his sentence and erred in ordering restitution.
 
 
 3
 After a careful review of the record, we conclude the court erred in allowing the government to introduce certain evidence that was sufficiently prejudicial to defendants so that a new trial is required. We therefore vacate the defendants' convictions and remand for a new trial.
 
 I.
 
 4
 Green River Coal Company, Inc. (Green River) is a coal mining company located in Kentucky. Clyde Brown, Jr. is a shareholder and former president of Green River.
 
 
 5
 On November 30, 1978, Big Rivers Electric Corporation (Big Rivers), a Kentucky electrical utility, solicited bids for a long-term coal supply contract, known as Contract 527, for a proposed electrical plant. Due to an inadequate response, Big Rivers sent out a second request for bids in September 1979.
 
 
 6
 On March 6, 1981, Green River submitted a proposal through its then president, Clyde Brown, Jr. offering coal at a price of $24.98/ton. On May 6, 1981, Big Rivers asked Green River to submit a lower bid.
 
 
 7
 Sometime in the spring of 1981, Clyde Brown, Jr. contacted Eddie Ray Brown (no relation to defendant) for assistance with the proposal. Eddie Ray had previously been successful in obtaining a long-term coal supply contract with Big Rivers for his coal company, E & M Coal. Eddie Ray had obtained that contract, known as Contract 589, through illegal means, although there is nothing in the record to show that Clyde Brown, Jr. had knowledge of that fact. In obtaining Contract 589, Eddie Ray had contacted Shirley Pritchett, a friend of William H. Thorpe. At that time, Thorpe was the general manager and chief operating officer of Big Rivers. In exchange for kickback payments, Thorpe agreed to provide confidential price information to Pritchett, who in turn, provided the information to Eddie Ray.
 
 
 8
 The initial meeting between Clyde Brown, Jr. and Eddie Ray Brown took place at a Ramada Inn in Henderson, Kentucky. At trial, Eddie Ray Brown testified regarding that meeting:
 
 
 9
 Q. When you met with Clyde Brown in the hotel, did he tell you what the purpose of the meeting was generally?
 
 
 10
 A. He said that since I had had a contract with Big Rivers, that if I could be of any help to him, he would appreciate it and make it worth my while, basically is what we talked about the first meeting.
 
 
 11
 Q. What, if anything, did Clyde Brown say about your success in getting Contract 589 the year before?
 
 
 12
 A. He made the statement more or less if you know somebody at Big Rivers and you ask them to help, I need some help, what can you do for me basically.
 
 
 13
 Q. That would be help from inside the corporation, Big Rivers?
 
 
 14
 A. That's right.
 
 
 15
 Q. What, if anything, Mr. Brown, did Clyde Brown say at this meeting about whether or not he had already put in a bid for Contract 527?
 
 
 16
 A. To my knowledge, there had been several bids put in. I think he had his in at that time, too.
 
 
 17
 Q. Well, if Clyde Brown had already put in a proposal to Big Rivers that was already there for 527, what was your understanding of what he wanted from you?
 
 
 18
 A. Find out where he stood.
 
 
 19
 (App. 438-39.)
 
 
 20
 Q. Do you remember specifically what Clyde Brown said in that meeting, specific words used?
 
 
 21
 A. I can't remember specific words. That's been too many years ago.
 
 
 22
 Q. About 16 years ago, correct?
 
 
 23
 A. Can you hear me now?
 
 
 24
 Q. Yes. It's been about 16 years ago, correct?
 
 
 25
 A. At least that long.
 
 
 26
 Q. Without quoting Mr. Brown, Mr. Clyde Brown, but focusing on his statements to you, what was the essence of what Clyde Brown wanted you to do as a result of this meeting?
 
 
 27
 A. Basically find out what price it would take to be successful in acquiring Contract 527.
 
 
 28
 Q. And what was your understanding from your experience at Big Rivers as to whether that price was publicly available information?
 
 
 29
 A. It was not public.
 
 
 30
 (App. 442-43.)
 
 
 31
 Thereafter, Eddie Ray Brown contacted Pritchett. Once again in exchange for kickback payments, Pritchett put Eddie Ray in contact with Thorpe, who in turn agreed to provide Eddie Ray with confidential price information.
 
 
 32
 Following Eddie Ray's contact with Thorpe, Eddie Ray met with Clyde Brown and advised him to lower his bid by $0.50/ton. Clyde Brown resubmitted the bid, offering to do business at $24.40/ton, or 58 cents less than the original bid. The contract was ultimately awarded to Green River.
 
 
 33
 In 1984, the year coal deliveries began under Contract 527, Clyde Brown had counsel for Green River prepare an "overriding royalty interest" agreement between Green River and Embro Holdings, a company owned by Eddie Ray Brown, compensating Eddie Ray for his assistance in securing the contract. In exchange for his services, Eddie Ray would receive one percent of the price of coal sold by Big Rivers. Over the life of the contract, payments were made in excess of $1.7 million. Eddie Ray in turn executed his own agreement with Pritchett, giving Pritchett one-half of what Eddie Ray was to receive under the royalty agreement. Pritchett had separately agreed to share his compensation with Thorpe.
 
 
 34
 Thorpe ran into financial difficulties, and in 1987 Eddie Ray and Pritchett bought out Thorpe for $200,000. Eddie Ray continued to pay Pritchett, however. Final payments were made to Pritchett under the agreement on January 11, 1990, and July 18, 1990, when Eddie Ray mailed checks from Indiana to Pritchett in Kentucky.
 
 
 35
 An indictment was returned against Thorpe, Clyde Brown and Green River in 1994 alleging mail fraud, Travel Act and tax violations. Thorpe became ill, and his trial was severed. The remaining defendants filed a motion in limine to prevent the government from introducing evidence regarding Contract 589 with Big Rivers, Eddie Ray Brown's having obtained the contract by agreeing to pay kickbacks to Pritchett and Thorpe. The court denied the motion, and a jury trial ensued. After the government rested its case, defendants moved for judgment of acquittal. The judge denied the motion. Defendants renewed the motion at the conclusion of the case, and following conviction, moved for a new trial. These motions also were denied. Green River received a $150,000 fine. It also was ordered to pay restitution to Big Rivers for the loss of honest services of its employee, Thorpe, in the amount of $200,000. Clyde Brown was found jointly and severally liable for that amount and also was sentenced to 18 months in prison followed by a 3-year term of supervised release and was ordered to pay a fine of $77,978.44.
 
 
 36
 Both defendants appeal their convictions and Brown raises a separate challenge to his sentence.
 
 II.
 
 37
 We first address defendant Brown's contention that the mail fraud and Travel Act counts are barred by the statute of limitations. In support of this argument he relies on evidence in the record to show that payments to Thorpe ended in 1987 while the indictment was not issued until 1994.
 
 
 38
 Defendant's argument is unavailing. Continuing criminal liability of an individual participant in a mail fraud scheme can only be mitigated by a legally effective withdrawal. United States v. Cohen, 516 F.2d 1358, 1364 (8th Cir.1975). In this case, payments to Eddie Ray Brown and Pritchett continued into 1990. The statute of limitations for mail fraud is five years, see 18 U.S.C. § 3282.
 
 
 39
 Even assuming the relevant criminal conduct occurred within five years, however, defendant Brown contends that the Travel Act counts are still time-barred. Defendant reaches this conclusion by applying the one-year state statute of limitations for Kentucky's commercial bribery statute. See KY.REV.STAT.ANN. § 500.050 (Banks-Baldwin 1995).
 
 
 40
 Although this court has not addressed which statute of limitations applies for Travel Act violations, federal law or the statute of limitations applicable to the underlying criminal activity, those circuits that have addressed the matter have applied federal law. See, e.g., United States v. Steele, 685 F.2d 793, 807 (3d Cir.1982); United States v. Cerone, 452 F.2d 274, 286 (7th Cir.1971). We agree with the conclusion reached in the other circuits and find the federal statute of limitations to apply.
 
 
 41
 We also reject defendant's ex post facto argument, see U.S. CONST. art. I, § 9, cl. 3. Defendant claims he was improperly convicted in 1994 for conduct that occurred in 1981 that was not made criminal until November 18, 1988. See 18 U.S.C. § 1346 (defining scheme to defraud to include deprivation of intangible right to employee's honest services). The jury was instructed it could not return a guilty verdict on an intangible rights theory unless it found that the necessary elements of the offense were supported by conduct that occurred after the effective date of the statute. In this regard, the same 1990 mailings that support the mail fraud count would also supply the necessary element for the Travel Act offense.
 
 III.
 
 42
 We next consider defendants' claims of error as they relate to certain of the court's evidentiary rulings. Because we find only the claim of error relating to the introduction of evidence concerning Contract 589 to have significant merit, we limit our discussion to that issue.
 
 
 43
 On May 19, 1993, Eddie Ray Brown was indicted in both the Western District of Kentucky and the Southern District of Indiana. United States v. Brown, No. CR93-00016-01-0(cs) (W.D.Ky. filed May 19, 1993); United States v. Brown, No. EV93-9-CR (S.D.Ind. filed May 19, 1993). The Kentucky indictment charged him with perjury, growing out of false statements he made under oath while testifying at a deposition. The deposition was taken in connection with civil litigation brought by the Pyramid Mining Company, which had been defrauded as a result of kickbacks taken by company officers, some of which were paid by Eddie Ray Brown.
 
 
 44
 The Indiana indictment charged Eddie Ray Brown with a number of different offenses growing out of the Pyramid Mining kickback scheme, as well as the Big Rivers kickback scheme involving Contracts 589 and 527. It is apparent that Brown had been cooperating with the government prior to the formal return of these indictments, because a plea agreement was executed between the government and Brown on April 29, 1993, almost three weeks before the return of the two indictments. The plea agreement covered both of the indictments. Although the plea agreement contained a number of terms and conditions, for our purposes the most significant one was the government's agreement to recommend that any term of incarceration would be limited to 15 months in return for Brown's full cooperation, a term substantially less than Brown was facing if convicted on all counts in the indictment.[1] Since there is no suggestion that Brown did other than live up to his part of the plea bargain, and since the government is not in the habit of buying a pig in a poke, we must conclude that by mid-1993 the government knew all about Brown's illegal activities as they related to Pritchett and Thorpe. When indicted, however, Brown was not charged with a conspiracy count. The next indictment of relevance was returned on August 25, 1993, when Shirley Pritchett was indicted in the Western District of Kentucky. United States v. Pritchett, No. CR93-00022-01-0 (cs) (W.D.Ky. filed Aug. 25, 1993). Although multiple offenses are charged against Pritchett, he was the sole defendant, and, as was the case with Eddie Ray Brown, he was not charged in a conspiracy count. Pritchett also entered into a plea agreement with the government, not unlike the one entered into by Brown. Pritchett pledged his full cooperation, and the government promised to recommend a sentence of 18 months incarceration. Again, we must conclude that Pritchett was cooperating with the government because he executed his plea agreement on August 18, 1993, one week before the indictment against him was filed.
 
 
 45
 For reasons best known to the government, Thorpe was not indicted until almost a year later, when on June 28, 1994, the indictment in this case was returned against Thorpe, Clyde Brown, Jr. and the Green River. Although Thorpe, due to illness, was severed from this case prior to trial, it is abundantly clear that had he been tried along with Brown and Green River, the evidence against him would have been overwhelming. Although Clyde Brown knew nothing of Thorpe, both Pritchett and Eddie Ray Brown testified at trial and deeply implicated Thorpe. Indeed, it does not appear that the government changed its proofs to any great degree when Thorpe was severed from the case, as a considerable amount of the testimony in the case concerned acts of wrongdoing on the part of Thorpe. Barring an aberration, had he not been severed from the trial, Thorpe would have easily been convicted based upon the evidence that was presented in his absence.
 
 
 46
 This brings us to the matter of Contract 589, and the introduction into evidence of the facts and circumstances surrounding that contract. If Thorpe had remained in the trial, the government would have been fully justified in offering all of the evidence that it presented in this case related to Contract 589, although it would have been presented with a limiting instruction as it related to the other defendants. With Thorpe not in the case, however, we are unable to see any legitimate reason for the introduction of the facts and circumstances surrounding Eddie Ray Brown paying kickbacks to Thorpe in connection with Contract 589. There is absolutely no testimony that Clyde Brown[2] had any knowledge that Eddie Ray Brown paid kickbacks to Thorpe in connection with Eddie Ray Brown's securing Contract 589 for himself.
 
 
 47
 The government's attempt to justify introducing the detailed evidence relating to Contract 589 by claiming it was background, is unavailing. Similarly, its argument that somehow Contracts 589 and 527 are inextricably intertwined is not the least convincing. The government did not just make a passing reference to Contract 589, it spent as much time developing the wrongful conduct as it related to Contract 589, as it did in presenting the evidence involving Contract 527. As early as its opening statement the government placed considerable emphasis on Contract 589. This continued to be the pattern during the trial, and in the closing argument repeated references were made to Contract 589. Indeed, the government was able to paint a much clearer picture as to Contract 589 because the actual participants were implicating one another. In contrast, relative to Contract 527, no one directly implicated Clyde Brown, and the case against him was built largely on inference. In our view, the government in effect tried Thorpe in absentia as to his wrongdoing in connection with Contract 589, and in doing so substantially prejudiced the case against Clyde Brown and Green River.
 
 
 48
 Since the government may elect to retry this case, we add by way of clarification that we are not suggesting that any reference to Contract 589 would have been inappropriate. For example, if Eddie Ray Brown were asked why he went to see Pritchett and Thorpe after he talked to Clyde Brown, he could have legitimately responded that he had paid kickbacks to Pritchett and Thorpe in the past and expected that he might do so again. This should end the matter, however, as no further development would appear to serve any legitimate purpose.[3] We do not know whether the government joined Thorpe and Clyde Brown as defendants in the same indictment as a matter of strategy or not. Pritchett and Eddie Ray Brown were both indicted separately, and certainly the government was aware of Thorpe's wrongdoing by the time it indicted Pritchett. In any event, whether it was strategy or happenstance, the government benefited from introducing testimony relating to Thorpe and Contract 589. Unfortunately, that benefit was to the substantial detriment of the other defendants in the case against whom the government's evidence was not nearly as strong as it had been against Eddie Ray Brown, Pritchett and Thorpe.
 
 IV.
 
 49
 Defendants urge that their conviction should be reversed because the evidence against them was insufficient. In our view, the evidence in the record, including the evidence that should not have been admitted, would have supported a jury finding of guilt as to Clyde Brown and Green River. Since we do not know what evidence will be relied upon if this case is retried, however, we do not speculate further on the sufficiency of the evidence.[4]
 
 
 50
 Because we remand for a new trial, we elect not to address any of the sentencing issues raised by the defendants.
 
 
 51
 REVERSED and REMANDED.
 
 
 52
 KENNEDY, Circuit Judge, concurring in part and dissenting in part.
 
 
 53
 I concur in the Court's opinion except that I would dismiss the mail fraud count for reasons not discussed in this opinion. I conclude that under the peculiar circumstances in this case, there was no mail fraud crime committed. The mail fraud statute, 18 U.S.C. § 1341, did not criminalize schemes to deprive another of the intangible right to honest services until 1988, when 18 U.S.C. § 1346 was enacted. While a number of circuits had held otherwise, the Supreme Court in 1987 held that the mail fraud statute was limited to the protection of property rights and did not extend to schemes to defraud individuals of their intangible rights. McNally v. United States, 483 U.S. 350 (1987). In response to McNally, Congress passed § 1346 to incorporate the intangible rights theory.[1] See United States v. Ames Sintering Co., 927 F.2d 232, 235 (6th Cir.1990). This section became effective November 18, 1988 and, of course, has no retroactive application. See United States v. Davis, 873 F.2d 900, 902 (6th Cir.1989).
 
 
 54
 The government acknowledges that there was not a violation of the mail fraud statute when the scheme to defraud Big Rivers was entered into. In 1987, Eddie Ray Brown and Pritchett bought out Thorpe, the only person of whose intangible services the victim, Big Rivers, was deprived, for a lump sum payment of $200,000. I fail to see how a scheme to defraud Big Rivers of the intangible services of Thorpe could come into existence after Thorpe stopped receiving payments. It is true that the payoff from the agreement or scheme continued in the form of payments from Eddie Ray Brown to Pritchett, but the mail fraud statute did not make it a crime to continue to receive payments from a scheme which, if entered into after its passage, would be illegal. The statute requires that there be in existence at the time § 1346 was enacted, or thereafter, an agreement or scheme to deprive someone of intangible rights. Even though an individual may be charged with the acts of a co-conspirator of which he or she is unaware, and mail fraud schemes are treated much like conspiracies, the co-conspirators here were not scheming with Thorpe or making payments to Thorpe after 1987.
 
 
 55
 In order to sustain a conviction on the mail fraud count, there must be some illegal conduct after the enactment of § 1346 that deprived Big Rivers of the intangible right to its employees' services or a conspiracy or attempt to do so. My review of the record convinces me that there was no such illegal conduct after Thorpe was bought out in 1987. Accordingly, I would dismiss the mail fraud count.
 
 
 56
 The above does not apply to the Travel Act, because commercial bribery was a crime under state law when the bribery took place. The Travel Act punishes the distribution of proceeds of unlawful activities. 18 U.S.C. § 1952(a)(1). Thus, I concur in the disposition of that count and the tax count and in all other respects in the Court's opinion.
 
 
 
 [1]
 Since the indictments and plea agreement as they relate to Pyramid Mining Company offenses are of no relevance to this appeal, we do not discuss them further
 
 
 [2]
 Since, for all practical purposes, Clyde Brown is Green River insofar as this criminal prosecution is concerned, any reference to Clyde Brown encompasses Green River
 
 
 [3]
 By not addressing any of the evidentiary claims of error, we do not mean to put our seal of approval on all of the evidentiary rulings made during this trial. We do indicate, however, that but for the ruling as it related to Contract 589, any other errors which may have been committed would not have required a retrial
 
 
 [4]
 We do not specifically address the arguments of the parties relative to the income tax count since it is dependent on the other counts
 
 
 [1]
 Section 1346 provides: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."