421 F.2d 547
 Allan Maurice GLAZERMAN, Appellant,
v.
UNITED STATES of America, Appellee.
Fred John PERELLA, Appellant,
v.
UNITED STATES of America, Appellee.
Mrs. Zita B. ARRIGO, Appellant,
v.
UNITED STATES of America, Appellee.
Billy Ray McDANIEL, Appellant,
v.
UNITED STATES of America, Appellee.
Lester Joe CHAMBERS, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 157 to 161-69.
 United States Court of Appeals Tenth Circuit.
 Jan. 16, 1970.
Rehearing Denied in No. 161-69 Feb. 16, 1970.
Rehearing Denied in No. 157-69 March 6, 1970.
 
 Julius Lucius Echeles, Chicago, Ill., for appellant Allan Maurice glazerman.
 Sanford W. Smith, Muskogee, Okl., for appellant Fred John Perella.
 Ernest R. Anthis, Jr., Muskogee, Okl., for appellants Mrs. Zita B. Arrigo and Billy Ray McDaniel.
 Sam Caldwell, Muskogee, Okl., for appellant Lester Joe Chambers.
 William J. Settle, U.S. Atty., Muskogee, Okl., for appellee.
 Before PICKETT, HILL and SETH, Circuit Judges.
 HILL, Circuit Judge.
 
 
 1
 Appellants Glazerman,[1] Perella, Arrigo, McDaniel, and Chambers were charged by indictment with fourteen substantive counts of using the mails to defraud in violation of 18 U.S.C. 1341, and one count of conspiracy in violation of 18 U.S.C. 371. Each appellant was convicted by a jury on all fifteen counts, and each was sentenced to a term of imprisonment.
 
 
 2
 The last count of the indictment charged appellants with a conspiracy to use the mails to defraud running from March 1, 1966, until December 11, 1967. Counts one through six respectively charged that appellants, in an effort to execute their alleged fraudulent scheme, mailed letters on September 30, October 23, November 13, October 18, December 21 and December 18, all in the year 1966. Similarly, counts seven through eleven charged appellants with mailing checks on December 7, September 6, September 20 and October 19 in the year 1966, and on January 16, 1967. Counts twelve through fourteen charged appellants with mailing letters on October 20, 1966, and January 21 and January 5 in 1967 for the alleged purpose of perpetrating a scheme to defraud. In summary, the dates excluding the conspiracy charge run from September 6, 1966, to January 21, 1967.
 
 
 3
 Appellants' first contention is that the evidence presented at trial was insufficient to sustain the guilty verdict. It is uncontroverted that the United States mails were used on the pertinent dates. So, the questions on the facts are whethere there was sufficient evidence of a conspiracy, and whether there was sufficient evidence to support the jury's finding of a scheme to defraud. At the outset, we must reiterate that an appellate court, in determining the sufficiency of the evidence is confined to whether, viewing the evidence in the light most favorable to the prosecution, there is substantial evidence, either direct or circumstantial, which together with reasonable inferences sustains the verdict.[2]
 
 
 4
 The government's evidence showed that in early March, 1966, Glazerman incorporated Oklahoma Brentwood Company in Oklahoma. All the stock was held by Glazerman, and no other appellant was directly involved in the incorporation. Glazerman leased office space in Oklahoma City on May 16, 1966. A corporate bank account was opened by him there, and on June 3, 1966, he filled out a signature card to become the authorized signatory for the corporation. On June 16, 1966, the signature card was revised to include Perella as an authorized signer. Glazerman also opened an office in Tulsa on August 1, 1966, and a bank account was opened in Tulsa on behalf of Brentwood on August 3, 1966.
 
 
 5
 Regarding management of the offices Perella was made manager of the Oklahoma City office on June 15, 1966. Perella quit in the third week of September, 1966, and an undisclosed person took over management of the office. In Tulsa, Arrigo became manager around August 15, 1966, and stayed until late October or the first of November. McDaniel then took over the Tulsa office for about three weeks. When McDaniel quit, Chambers took over for a short time. Each person was hired by Glazerman.
 
 
 6
 Oklahoma Brentwood's business was selling built-in or centrally installed vacuum cleaners on a referral basis. Brentwood's salesmen called on people in their homes and tried to interest them in buying one of these cleaners, which operated via inlets in the walls of the home. They sold the vacuum cleaners for $899 although the price could amount to as much as $1200 when financing charges were included. Substantial evidence indicates that the machine operated to the expectations of the purchasers, and few found fault with the quality of the merchandise.
 
 
 7
 The sales were made in connection with a referral program whereby customers were told they could earn commissions from Brentwood which would defray the cost of the vacuum they had purchased. The proposition was, if a customer would give Brentwood the names of 25 qualified persons to contact about buying a vacuum cleaner cleaner, the customer supplying the names would earn $350 in commissions. For 50 qualified names, Brentwood would pay $700. If any of these referrals purchased a vacuum, the customer submitting the referral's name would earn a $100 commission.
 
 
 8
 Brentwood generated leads to future sales through this referral system of selling. Brentwood's salesmen would take the previous customer's referral names back to the office along with a commission agreement authorizing Brentwood to use the customer's name to contact the referrals. Brentwood then sent a letter to the referral parties over the name of the previous customer who had referred Brentwood to those parties. The letter invited the referral parties to allow a Brentwood representative to come into their homes and introduce them to 'an exciting new program.' Several days after the letter was mailed, Brentwood's phone girls would telephone the referrals and ask them to make appointments at their homes with a Brentwood salesman. Up to this point, the referral parties were told nothing about buying a vacuum cleaner. If an appointment was agreed to, a salesman would go to the referral's home and make a vacuum cleaner sales presentation while trying to enroll them into the referral program.
 
 
 9
 When a Brentwood salesman got into a prospective purchaser's home, the basic sales pitch was that Oklahoma Brentwood Company was forsaking media advertising and adopting word of mouth advertising via the referral program, and Brentwood was paying $350 for 25 qualified referral names in lieu of spending money on advertising. This sales pitch was supposed to be a uniform one for all salesmen, and it was adopted from a referral sales operation in Texas which Glazerman had begun before Oklahoma operations were started. A copy of the Texas sales presentation was placed in evidence, and there was testimony that an identical format was brought to Oklahoma and used exclusively.
 
 
 10
 For the referral names to be qualified, the names had to be people who owned their own homes, who had good credit, and who would allow a Brentwood salesman to make a complete sales presentation to them. Brentwood's salesmen were supposed to contact the referrals, make a sales presentation and, depending upon whether the referral made a purchase, make out an acceptance or rejection slip on each referral. There was testimony that the slips were not always made out or turned in at the office. Also there was some conflicting evidence on whether the customers always knew that one element of qualifying their referrals was that a complete sales presentation had to be made to the referral.
 
 
 11
 When a customer purchased a vacuum cleaner he signed a conditional sales contract, a supplementary contract, and a commission agreement, and he got a copy of each. Upon making a sale, Brentwood's practice was to discount the note on the contract with a finance company. But the finance company would only tentatively take the paper until there was a showing the installment contract was satisfactory in all respects. To accomplish this, Brentwood would send a public relations man to interview the purchaser after the sale but prior to discounting the contract. The public relations man would see if the customer was satisfied with the vacuum cleaner, and they would go over the sales contract and commission contract (referral program) to clear up any misconceptions. The customer was to understand that the compensation under the earnings agreement did not in any way effect the obligation under the conditional sales contract. Customers signed a form stating that the only agreements made were those stated in the sales contract and commission agreement. After this was accomplished Brentwood would turn the contract over to the finance company. Then the finance company also had a representative contact the purchaser to make sure the purchaser understood all that he had agreed to. If all went well, the installment contract was discounted to the finance company.
 
 
 12
 Most of the alleged misrepresentations centered on the sales presentation and referral program. Customers were told that Brentwood was a well known company, that it had been spending large sums of money in media advertising for twelve years, and that it intended to spend two million dollars in referrals in Oklahoma in lieu of media advertising. Customers were told that they could recoup the costs of their vacuum cleaners through the referral program, and that others had done so and were making money now. The sales presentation said that 62% Of the referrals contacted would purchase and that 25 referrals could be contacted in a month after the referral. The sales presentation indicated that there were two separate agreements: the sales agreement and the referral commission agreement. But the commission was the initial lure used to get into the customer's home; and it was the main emphasis of the sales presentation whose real object was to sell the customer a vacuum cleaner.
 
 
 13
 In considering whether the evidence is sufficient to warrant the jury's verdict, it is most appropriate and instructive to reiterate the words we used in Beck v. United States, 305 F.2d 595, at 598 (10th Cir. 1962): 'Fraud or the existence of a fraudulent scheme is seldom susceptible to proof solely by direct evidence and in nearly every such case, direct and circumstantial evidence together with the inferences to be drawn therefrom must be relied upon for proof. On the face of the business operation involved here, it may be argued that it was merely a legitimate business venture that did not work out successfully. That, however, was a question of fact, to be determined by the jury after considering all of the evidence and the inferences to be drawn therefrom.'
 
 
 14
 We have carefully read the entire trial transcript which is composed of over 1000 pages covering a multitude of exhibits and witnesses. We find that there was sufficient evidence before the jury to find a scheme to defraud, a conspiracy to use the mails to execute the scheme, and overt acts which ripened the scheme. There is substantial evidence that referral customers were falsely told that Brentwood was well known, that it had spent money on advertising in the past, that two million dollars would be spent in the future, and that the program would make money for any referral customer that joined up. Some customers were falsely told that they were among the first contacted in their area, and no customer was told that it was mathematically impossible for every customer to make money once the community was saturated by people in the referral program.
 
 
 15
 The evidence is conflicting on whether customers were misled as to what was necessary to qualify the names they submitted as referrals. But even if they knew that one qualification was that a referral had to hear a complete sales presentation and sign an acceptance or rejection slip, it is clear that the customers were not told that the slips were not always made out or turned in. Perhaps the most enlightening evidence concerning the referral commission program is a witness' testimony that Mrs. Arrigo, while talking to the witness about becoming a saleswoman for Oklahoma Brentwood, said that it would never happen that $350 or $700 would be paid out on referral names, i.e., 'they just wouldn't let it happen.'
 
 
 16
 Since, however, an individual cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual had joined or after he had withdrawn from the conspiracy,[3] we have examined the record to determine whether each appellant was a member of the conspiracy at the time of the substantive offenses charged in the indictment. The record discloses that the substantive offenses occurred on dates beginning with September 6, 1965, and ending with January 21, 1967. Glazerman clearly was involved in the conspiracy at all times during that period. However, with regard to Perella, the uncontroverted evidence is that he started with Oklahoma Brentwood in mid-June, 1966, and quit in the third week of September, 1966. Consequently, he is criminally liable only on substantive counts 8 and 9 which are dated September 6 and 20, 1966, respectively, and on the conspiracy count. Similarly, Arrigo began on July 1, 1966, and worked through approximately November 1, 1966. Thus, Arrigo is liable on counts 1, 2, 4, 8, 9, 10, 12 and 15. With respect to McDaniel, he began in early October, 1966, and stayed on until January, 1967. So McDaniel can be liable only on counts 2, 3, 4, 5, 6, 7, 10, 12 and 15. Regarding the tenure of appellant Chambers, he is criminally liable for the counts beginning in late November. That includes counts 5, 6, 7, 11, 13, 14 and 15. The convictions of the appellants are reversed on the counts indicated. However, our rule is clear that if a person is convicted and sentenced concurrently on several counts, some of which are reversed on appeal, the judgment and sentence will not be reversed if the sentence does not exceed that which may be lawfully imposed on the valid counts.[4]
 
 
 17
 Having disposed of the sufficiency of evidence issue, we turn now to appellant Glazerman's additional points on appeal. He first contends that it was error not to grant his motion for severance. This contention is grounded upon the fact that the trial court permitted the jury to consider testimony concerning out-of-court statements against Glazerman made by the other defendants. The true nature of this contention is more aptly stated by the court in Bruton v. United States, 391 U.S. 123, at 137, 88 S.Ct. 1620, at 1628, 20 L.Ed.2d 476 (1968): 'Here the introduction (of co-defendant's statements) posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore.'
 
 
 18
 The statements which Glazerman complains about are: First, testimony by government witness Noeth that in February, 1967, he located Arrigo for the purpose of getting payment on a $100 Brentwood check which had bounced. Arrigo had long since ceased working for Brentwood and had a new job. According to Noeth, Arrigo at that time said Glazerman owned Brentwood, Glazerman owed Arrigo over $1,000, that Arrigo doubted if she would ever collect it, Glazerman owed other people money, and finally she referred to Glazerman as a crook. Secondly, a postal inspector was allowed to read into evidence a statement he had obtained from Perella wherein Perella said that he drained his own finances to loan money to Glazerman, that twice before he had been in the referral business with Glazerman, that one of the businesses folded up and the other was sold, that Perella never received the money for his interest in the referral business which was sold. Also, Perella said he left Brentwood after a violent argument with Glazerman brought on because Glazerman withdrew funds from the bank account and kept the account broke most of the time. Third, McDaniel also made a statement to a postal inspector which the inspector read at the trial; it stated that Glazerman carried the bank book with him at all times, made all deposits, and wrote all the checks as far as McDaniel knew. Fourth, Chambers' statement to a postal inspector was introduced in a like manner and its contents relating to Glazerman are that Chambers had received several hot checks and as a result he had some difficulty with his personal checks. Chambers also said that Brentwood still owed him some $2000.
 
 
 19
 Regarding the postal inspector's testimony, the court and defense attorneys were earlier advised of the postal inspector's memorandums of the interviews with each co-defendant. Each defense attorney was shown the written memorandums at a conference convened to prune any objectionable matter from the memorandums. Parts of the memorandums were so deleted, and it was agreed that remaining parts would be read into evidence by the inspector. When the postal inspector was called to testify, the court excused the jury and asked defense counsel whether they had any objection to reading the memorandums. Only Chambers objected, and that on the basis that he was not fully advised of his rights when he made the statement.
 
 
 20
 Upon considering whether there was any error from allowing the statements into evidence, we first note that Glazerman failed to object to the introduction of the co-defendants' statements. But the possibility of serious prejudicial error compels us to go further and consider the point beyond the fact that counsel for Glazerman had the opportunity to go over the statements before they were introduced. Delving into this matter more fully, we find that Arrigo, Perella, and McDaniel subsequently testified at the trial, and Glazerman's counsel had the opportunity to cross-examine them. That this opportunity to cross-examine them provided sufficient confrontation of the witness is evident from a reading of Harrington v. California, 393 U.S. 250,89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).
 
 
 21
 Additionally, we are convinced that any error in the admission of Arrigo, Perella, McDaniel and Chambers' extrajudicial statements about Glazerman was harmless error.[5] What appellant Glazerman calls accusatory statements do not in fact accuse him of the substantive or conspiracy offenses charged in the indictment against him. At the very most, the statements impinge upon Glazerman's credibility. Regarding his co-defendants' statements, we can only repeat what the Supreme Court said in Harrington v. California,supra, at 287, 89 S.Ct. at 1728: 'Their evidence, supplied through their confessions, was of course cumulative. But apart from them the case against (Glazerman) was so overwhelming that we conclude that this violation of Bruton was harmless beyond a reasonable doubt * * *.'
 
 
 22
 Glazerman further complains on appeal that the trial judge assumed the role of an advocate, thus aligning himself with the prosecution. While appellant rightly admits that the trial judge is not a mere moderator or umpire and within reasonable bounds has the right to participate in eliciting the truth, appellant contends that the trial judge's questions were unreasonable, argumentative, accusatorial, and prosecutorial. Glazerman sums up saying that the record clearly demonstrates the court's partisanship.
 
 
 23
 It can hardly be said that the trial judge's questions constituted extensive participation in the trial, particularly in view of the length of this trial and the voluminous testimony. Furthermore, the questions propounded to the witnesses by the court shed new light on the evidence. We cannot agree with appellant Glazerman that the record clearly demonstrates that the court was partisan. The court asked questions of prosecution witnesses as well as defense witnesses, and we perceive no difference in the treatment he gave each. It is noteworthy too that the trial judge, after Glazerman had left the witness stand, cautioned the jury not to take the court's inquiry of any witness as an expression of a view or an opinion on the part of the court concerning the facts in this case. The court reiterated this upon instructing the jury. We conclude this point by stating that the record here is in no way comparable to the cases cited by appellant Glazerman.
 
 
 24
 Glazerman also argues that the court invaded the province of the jury by stating in his instructions to the jury that there was no dispute as to certain elements of the case. Specifically, the court said, 'And, finally, you must find that in addition to these things, the agreement and the membership in the conspiracy, that some overt act was committed to carry it out. I don't think that there is any question, any substantial question in your minds that any number of acts were committed which are alleged to have been done by the overt acts which you will see in the indictment when you go to the jury room. The problem that you will have to decide is whether there was an agreement among these people to violate the law, and whether or not any such agreement, any particular defendant was a member of that.'
 
 
 25
 Previously the court had instructed the jury on what an overt act is and had used the example of leasing office space in Tulsa. Besides this particular example, there were a number of overt acts which were alleged and which were proved without contradiction by the evidence of both the prosecution and defense. In this context, the trial judge's comment-- that he thought there could be no substantial question in the jury's mind that some of the overt acts were performed-- was an aid to the jury in defining exactly what question was before them.
 
 
 26
 While the trial judge may have, to some extent, dissected and analyzed the evidence, he did not distort or add to it. The court was not misleading or one-sided, and there were no deductions not warranted by the evidence. The trial court did not exceed the mandate expressed in Sadler v. United States, 303 F.2d 664, 666 (10th Cir. 1962), and Minner v. United States, 57 F.2d 506, 513 (10th Cir. 1932). We need only further add that at the end of his instructions, the trial judge asked if counsel had any objections. But appellant's trial counsel neither objected or offered any further instructions; thus this question was not properly preserved for review.
 
 
 27
 We next consider whether the trial court improperly urged the jury to return a verdict by the end of the same afternoon in which the case was submitted to them. Glazerman complains that the trial court, upon originally sending the jury to deliberate, said, 'Now, I am going to send you to the jury room and ask you to begin your deliberations; continue your deliberations for a reasonable period of time. If it appears that you are going to have to take a great deal longer than a reasonable hour, why send word to me and I will see whether or not I can allow you to go home for the night and return to complete your deliberations tomorrow. But, I would like for you to see if you can arrive at a verdict this afternoon.' Glazerman claims that when the jury returned a verdict that same afternoon, they were following the court's orders.
 
 
 28
 Nothing in the record indicates how late in the afternoon this instruction was given and the case submitted to the jury. Absent an indication that the jury was given a very short time to deliberate that afternoon, we can only conclude that the reasonable impact of the instruction was to advise the jury that they would be required to work for only a reasonable length of time that day and if they failed to reach a verdict by the end of the ordinary work day, the court would dismiss them for the night and have them return in the morning to complete their deliberations. We do not favor the words used in this instruction especially since it is perilously close to the instruction we found objectionable in Burroughs v. United States, 365 F.2d 431 (10th Cir. 1966). But the circumstances and context are sufficiently different to require a different conclusion.[6]
 
 
 29
 Appellant Glazerman's last complaint on appeal is that the form submitted to the jury did not include a 'not guilty' verdict,[7] and thus it deprived Glazerman of his Sixth Amendment right to a trial by jury. We find no merit in the argument that implicit in the form was an insinuation of judicial attitude toward the ultimate conclusion of guilt or innocence.
 
 
 30
 Appellant Glazerman's convictions on all 15 counts are Affirmed. Appellant Perella's convictions on counts 1, 2, 3, 4, 5, 6, 7, 10, 11, 12, 13, and 14 are Reversed and his convictions on counts 8, 9 and 15 are Affirmed. Appellant Arrigo's convictions on counts 3, 5, 6, 7, 11, 13, and 14 are Reversed and the convictions on counts 1, 2, 4, 8, 9, 10, 12, and 15 are Affirmed. Appellant McDaniel's convictions on counts 1, 8, 9, 11, 13 and 14 are Reversed and his convictions on counts 2, 3, 4, 5, 6, 7, 10, 12 and 15 are Affirmed. Appellant Chambers' convictions on counts 1, 2, 3, 4, 8, 9, 10, and 12 are Reversed and his convictions on counts 5, 6, 7, 11, 13, 14, and 15 are Affirmed. Concluding, we hold that the judgment and sentence on each of the valid counts remains in force and effect and the judgment and sentence on each of the invalid counts is null and void.
 
 
 
 [1]
 Throughout the record there is a discrepancy in the spelling of the name of appellant Glazerman. In some parts it is spelled Glezerman but the indictment, order of judgment and sentence and notice of appeal all use the name Glazerman
 
 
 [2]
 Bailey v. United States, 410 F.2d 1209 (10th Cir. 1969); Thomas v. United States, 409 F.2d 730 (10th Cir. 1969); Michael v. United States, 393 F.2d 22 (10th Cir. 1968)
 
 
 [3]
 Gradsky v. United States, 376 F.2d 993 (5th Cir. 1967); See Levine v. United States, 383 U.S. 265, 86 S.Ct. 925, 15 L.Ed.2d 737 (1966); Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1945)
 
 
 [4]
 Romonito v. United States, 400 F.2d 618 (10th Cir. 1968); Marteney v. United States, 218 F.2d 258 (10th Cir. 1955), Cert. Denied 348 U.S. 953, 75 S.Ct. 442, 99 L.Ed. 745
 
 
 [5]
 Harrington v. California, 393 U.S. 250, 89 S.Ct. 1726 (1969); see also Cleaver v. United States, 238 F.2d 766, 770 (10th Cir. 1956)
 
 
 [6]
 Cf. Darby v. United States, 283 F.2d 896, 898 (10th Cir. 1960)
 
 
 [7]
 As to each count, the verdict form read, 'We, The Jury in the above entitled cause, duly empaneled and sworn, upon our oaths, find the defendant --- guilty in manner and form as charged in the first count of the indictment.'