**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 29, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

OSCAR GARCIA-RUIZ,

    Defendant - Appellant.

No. 10-1030
(D. Colo.)
(D.C. No. 1:07-CR-00188-WDM-17)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

---

Oscar Garcia-Ruiz appeals from his conviction and sentence for his participation

in a conspiracy to possess and distribute cocaine.  He complains about a jury instruction

and evidentiary rulings.  Because his arguments are unavailing we affirm his conviction.

He also alleges the district court erred in determining the drug quantity used to establish

the guideline sentencing range and erroneously applied a two-level enhancement for his

---

[*] The parties have waived oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  This case is submitted for decision on the briefs.

    This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A).  Citation to unpublished decisions is not prohibited.  Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value.  10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished).  *Id.*

possession of a firearm in connection with a drug offense.  We see no error in firearm enhancement but cannot find evidence of record supporting the drug quantity necessary for the guideline employed (150 kilograms).  Nevertheless the quantity error may well be harmless as the district judge varied from the guidelines and the sentence ultimately imposed is less than the guidelines would recommend for the drug quantity actually revealed by the record.  As we cannot determine whether the sentence would be different had the proper quantity been contemplated we must remand for resentencing.

## I.        FACTUAL BACKGROUND

"Mike," a Mexico citizen located in Juarez, was the primary supplier of an extensive cocaine distribution conspiracy.  (R. Vol. 2 at 201-202.)  Mike employed several people to transport the cocaine from El Paso, Texas, to the Denver, Colorado area.  In October, 2006, shipments ranging from 25-30 kilograms were delivered approximately every other week.

The recipients were members of a group headed by brothers Luis and Alejandro Camacho-Levario (the Camacho Group) and their partner, Jose Muñoz.  The Camacho Group and Muñoz split the deliveries from Mike evenly.  Alejandro primarily ran the distribution business while Luis kept the books.  Around November 2006, an ongoing investigation led law enforcement officers to become aware of the Camacho Group and discovered it had been selling drugs for period of years.  Pursuant to a warrant, federal agents began taping telephone calls from various numbers belonging to members of the Camacho Group in late November 2006.  Garcia-Ruiz was identified as a "runner" for Alejandro.  He made drug deliveries and collected money for the organization beginning

- 2 -

in October 2006. On January 8, 2007, a shipment of cocaine from Mexico on its way to Denver was confiscated by New Mexico police. Two days later, Alejandro was arrested for violating his parole and was incarcerated in the county jail until April 2007. After Alejandro's arrest, Luis called Garcia-Ruiz seeking his assistance in collecting money owed to the Group from previous distributions. Following the confiscation of Mike's shipment, cocaine became scarce. Mike sent no further shipments (because his supply to quality cocaine was cut off) and the Camacho Group was unable to find another supplier able to provide large quantities.

On April 26, 2007, the law enforcement investigation culminated in an area-wide "take-down," requiring the assistance of several hundred officers.[1] (*Id*. at 607.) Numerous arrest and search warrants were issued and executed. Luis, Alejandro, Garcia-Ruiz and many others were arrested. Search Team No. 11 was assigned to search Garcia-Ruiz's apartment. Christopher Amon, an agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), testified to recovering a purse which contained a .380 semiautomatic revolver from underneath the kitchen sink in Garcia-Ruiz's apartment.

## II.        PROCEDURAL BACKGROUND

Seventeen members of the Camacho Group were charged with drug possession, distribution and conspiracy charges in a 29-Count indictment. Garcia-Ruiz was tried on: conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine (Count 2); the December 7, 2006 distribution and possession with intent to

---

[1] The take-down resulted in charges against eighty persons involved in the drug trade.

- 3 -

distribute more than 500 grams but less than 5 Kilograms of cocaine (Count 15); the December 13, 2006 distribution and possession with intent to distribute more than 500 grams but less than 5 kilograms of a Schedule II substance and aiding or abetting the same (Count 17); the January 28, 2007 distribution of more than 500 grams but less than 5 kilograms of cocaine (Count 24); and possession of a firearm and ammunition which had been transported in interstate and foreign commerce while being an alien unlawfully in the United States (Count 26).

By the time of trial, all but two defendants, Garcia-Ruiz and Roberto Lopez, had pled guilty or agreed to cooperate with the government. The evidence at trial consisted of testimony from several co-conspirators, law enforcement officers and the tapes from the recorded telephone conversations. The jury found Garcia-Ruiz guilty on all counts and entered special verdicts finding the drug quantities as charged (more than 5 kilograms in the conspiracy charge and, in the individual possession charges, more than 500 grams but less than 5 kilograms) in each count.[2] Eventually, Count 15 was dismissed.

The presentence report calculated Garcia-Ruiz's offense level as 38 based, in part, on a drug quantity of greater than 150 kilograms (the amount considered solely for sentencing purposes as opposed to the 5 kilograms considered in the guilt stage) and a criminal history category of III, resulting in a guideline range of imprisonment for 360 months to life. The sentence also included, over Garcia-Ruiz's objection, a two-level enhancement for the firearm found during the search of his apartment. Garcia-Ruiz also

---

[2] The jury found Lopez guilty on three counts but not guilty on one count.

objected to the 150 kilogram drug quantity. He argued his involvement in the conspiracy was limited to November through January, when the drug trafficking all but ended due to the government's seizure of the shipment on January 8, 2007. Therefore, he claimed, the evidence established he should be held responsible for no more than 100 kilograms. He also argued the sentences given to others in the organization in a similar role were much lower – less than ten years – so a variance below the Guidelines would avoid sentencing disparity. He requested a sentence of imprisonment of no more than ten years. At his sentencing hearing, Garcia-Ruiz testified about his failure to cooperate with the government prior to trial explaining his failure was only because his immediate family still lives in Mexico and he feared retaliation against them if he cooperated.

Pointing to Garcia-Ruiz's involvement in the conspiracy for a period of six months – from October 2006 through April 2007 – the government argued testimony established there were shipments from Mexico of 25 to 30 kilograms every other week. In addition, after the shipments were discontinued from Mexico, Garcia-Ruiz actively collected debts for the conspiracy and assisted in attempts to find an alternative supplier. Thus, the evidence supported an estimate (for sentencing purposes) holding Garcia-Ruiz responsible for 150 to175 kilograms moved by the conspiracy during his involvement.

The court overruled Garcia-Ruiz's objection to the drug quantity concluding the jury was given sufficient evidence to find Garcia-Ruiz was involved in a conspiracy distributing more than 150 kilograms of drugs and his involvement was not insignificant. The court also overruled his objection to the two-level gun-based enhancement because evidence demonstrated there was a sufficient relationship between the location of the gun

and his going to and from the apartment during drug transactions.

The court stated:

I am presented with a situation where the leader faces 180 months. The government seeks twice the amount of that. The probation officer, without specific recommendation, believes that the Guideline sentence should be moderated with a variant sentence under the statute. And I agree. And how does one measure that in a fair way and come up with a sentence that is sufficient but not greater than necessary.

I do take into account the reality of cooperation, including, as [the] government argues, that others perhaps [may be] threatened as well, although I agree with this defendant that specific locale is an obvious threat to this defendant and his family. But in any case, there is that to be taken into account.

I feel that the highest sentence that's been given to someone so far is 194 months. The involvement of that individual, although he cooperated, was again, much more extensive than this defendant. He was an organizer. He was involved with a gun. He purchased and sold large amounts of cocaine . . . . And I conclude that a sentence for this defendant that is essentially the equivalent of what the government feels is a maximum sentence for the kingpins sufficiently takes into account his lack of cooperation and I will conclude with a sentence of 180 months for this defendant.

(Supp. Vol. 2 at 26-27.)

In this appeal Garcia-Ruiz claims the district court erred at trial by: (1) improperly responding to a jury question concerning the amount of drugs he conspired to distribute as a part of the conspiracy; and (2) by allowing testimony of a drug deal not charged in the indictment. He claims the court erred at sentencing by: (1) assessing him responsible for the distribution of over 150 kilograms of drugs; and (2) applying the two-level enhancement for possession of a firearm in connection with his drug offense.

## III.    DISCUSSION

A.    <u>Response to Jury Question</u>

Garcia-Ruiz maintains the district court improperly instructed the jury regarding the special verdict form finding him guilty of conspiring to distribute more than 5 kilograms of cocaine.  "The question of whether the jury was properly instructed on the law is a legal question reviewed de novo."  *United States v. Urbano*, 563 F.3d 1150, 1154 (10th Cir.), *cert. denied*, 130 S. Ct. 434 (2009).  "We reverse only in those cases where we have a substantial doubt whether the jury was fairly guided in its deliberations." *Martinez v. Caterpillar*, *Inc.*, 572 F.3d 1129, 1132 (10th Cir. 2009) (quotations omitted).

The verdict form, designated "Special Verdict as to Count Two," stated in part:

> If you find the defendant guilty of Count Two, please answer the following questions (your answers must be unanimous):
>
> 1. Do you find that the government proved beyond a reasonable doubt that the defendant, OSCAR GARCIA-RUIZ, conspired to distribute or possess with intent to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine?
>
>   ____ Yes
>
>   ____ No

(R. Vol. 1 at 1303.)

After the jury began deliberations, it sent a note to the district court asking the following question:

> As to the special verdict regarding Count 2, defendant OSCAR GARCIA-RUIZ: does the phrase ". . . conspired to distribute or possess with intent to distribute . . ." refer to the alleged conspiracy as a whole; the sum total of Oscar Garcia-Ruiz's involvement; or the maximum amount of cocaine Oscar Garcia-Ruiz distributed or possessed with intent to distribute on any one occasion?

(R. Vol. 1 at 1299.)  Over Garcia-Ruiz's objection, the court responded: "Members of the Jury: The special verdict forms as to Count Two refer to the conspiracy as a whole."  (R. Vol. 1 at 1300).

"[A]n individual cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual had joined or after he had withdrawn from the conspiracy . . . ."  *Glazerman v. United States*, 421 F.2d 547 (10th Cir. 1970).  Garcia-Ruiz contends the district court's response to the jury's question erroneously allowed consideration of co-conspirators' activities occurring long before his involvement in the conspiracy began in October 2006.  He also asserts the error was clearly prejudicial because the jury's question "suggests that, even if it was prepared to convict Mr. Garcia-Ruiz of conspiracy to distribute drugs, it was not prepared to find that he was responsible for distributing 5 kilograms or more of cocaine."  (Appellant's Br. at 14.)

The government responds that the purpose of the special verdict form was not to determine personal criminal liability for a specific quantity.  Rather, the purpose was to determine the amounts applicable to the conspiracy as a whole for purposes of establishing a maximum mandatory sentence for all co-conspirators.  *See United States v. Stiger*, 413 F.3d 1185, 1193 (10th Cir. 2005).  Under 21 U.S.C. § 841, the statutory maximum sentence for distribution of over 5 kilograms is life imprisonment.  *See* 21 U.S.C. § 841(b)1(A).  On the other hand, less than 5 kilograms but more than 500 grams is a maximum sentence of forty years imprisonment.  *See* 21 U.S.C. § 841(b)1(B).  Once the statutory maximum sentence for the conspiracy was set by the jury beyond a

- 8 -

reasonable doubt, Garcia-Ruiz's personal liability would be ascertained at sentencing by a preponderance of the evidence. Thus, the court's response was a correct statement of law.

We agree with the government; *Stiger* governs this issue. In *Stiger*, the defendant argued the verdict forms erroneously required the jury to decide the amounts of each different drug type for the entire conspiracy rather than those types and amounts attributable to him. *Id*. at 1192. The district court concluded *Apprendi*[3] did "not require the jury in a conspiracy case to make individual findings as to each member of the conspiracy, determined Mr. Stiger was integral to the conspiracy and could be sentenced as though he were responsible for the full drug types and quantities, . . ." *Id*.

We affirmed:

> *Apprendi* require[d] the jury only to set the maximum sentence ( i.e., the ceiling) under which each coconspirator's sentence must fall. The judge, however, may determine the floor by finding the precise drug quantity attributable to each coconspirator. The jury is not required to make individualized findings as to each coconspirator because [t]he sentencing judge's findings do not, because they cannot, have the effect of increasing an individual defendant's exposure beyond the statutory maximum justified by the jury's guilty verdict.

*Id*. at 1193 (quotations and citations omitted).

Garcia-Ruiz attempts to distinguish *Stiger* by stating we did not address "whether the jury can be instructed to consider drug[] quantities distributed prior to a defendant's joinder in a conspiracy." (Appellant's Br. at 14-15 n.2.) While we may not have directly addressed this point, it is well-settled that "[g]enerally speaking, a defendant who joins an

---

[3] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

ongoing conspiracy may be held accountable -- for purposes of determining the scope of liability for the *conspiracy* charge itself -- with the acts or statements of coconspirators that occurred prior to his entry into the conspiracy, if those acts or statements were in furtherance of the conspiracy." *United States v. Hamilton*, 587 F.3d 1199, 1207 (10th Cir. 2009) (emphasis added), *cert. denied*, 130 S. Ct. 3443(2010). We distinguished *Glazerman*, explaining, while "a defendant cannot be held liable for *substantive crimes* committed by coconspirators prior to his entry in the conspiracy," a defendant's liability for involvement in the *conspiracy* may include legal responsibility for acts of coconspirators prior to that defendant's entry into the conspiracy. *Id*. at 1208 n.5.

Count 2 charged Garcia-Ruiz with intentionally conspiring to distribute 5 kilograms or more of cocaine. The special verdict form related solely to the conspiracy count, not Garcia-Ruiz's substantive counts of possession or distribution. Every member of the conspiracy was thus potentially subject to a maximum penalty of life imprisonment depending on their substantive participation to be proven at sentencing. The district court properly instructed the jury as to the law.[4]

---

[4] Even if we were to conclude the district court erred, any error would be "harmless error." Fed. R. Crim. P. 52(a). The government bears the burden of showing that a nonconstitutional error is harmless. *United States v. Wittgenstein*, 163 F.3d 1164, 1169 (10th Cir. 1998). An error "is harmless unless it had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect." *United States v. Cestnik*, 36 F.3d 904, 910 (10th Cir. 1994). The record demonstrates the conspiracy distributed well over 5 kilograms of cocaine during Garcia-Ruiz's involvement with the Camacho Group. Luis Camacho testified he observed Garcia-Ruiz pick up a shipment of approximately 25 kilograms. Thus, we have no doubt the jury would have reached the same conclusion on the special verdict form if it were instructed to consider only the actions of the Camacho Group between October 2006 and January 2007.

B.    Conduct Not Charged in the Indictment

Over Garcia-Ruiz's objection, Officer Mike Prince testified that on February 17, 2007, he saw Garcia-Ruiz riding as a passenger in a Ford Taurus. The Taurus entered a parking lot and parked next to a white car. Garcia-Ruiz got out of the Taurus and entered the front passenger side of the white car. Both cars then left and drove to another parking lot about eight blocks away. The vehicles stopped for a few minutes and Garcia-Ruiz then returned to the Taurus. The cars left the lot driving in different directions. Based on Prince's observations, uniformed officers were asked to assist. The white car was stopped and officers found sixty-six grams of powder cocaine. Later that afternoon, while Prince was conducting surveillance on a business, Prince saw the Ford Taurus and several other vehicles arrive. The occupants, including Garcia-Ruiz, went in and out of the business and then left in their respective vehicles. A traffic stop conducted on the Taurus identified Garcia-Ruiz as a passenger and discovered a hollowed-out dictionary containing 160 grams of cocaine.

At the close of evidence that day, the court dismissed the jury and addressed counsel:

> As I heard the ongoing evidence from Mr. Prince, I question whether I should have admitted it under 404(b), and my inclination is to give an instruction to the jury that the basic principle that any other criminal activity should not be considered by them as well as emphasizing, I guess, that there wasn't any concrete evidence against him.

(R. Vol. 2 at 637-38.) The court invited counsel to state their positions and specifically asked defense counsel to give some thought to a proposed instruction.

The next day, defense counsel suggested the court give a limiting instruction but

- 11 -

left it "to the Court's good discretion as to what the appropriate verbiage or language should be." (*Id*. at 644.) During final instructions to the jury, the court instructed:

> The defendants are not on trial for any act or any conduct not specifically charged in the indictment. And in this regard, I want to observe for you that during the course of the trial, over defendants' objection, I allowed Officer Prince to testify as to his ongoing surveillance of the defendant Garcia-Ruiz in matters that were unrelated to the charges that are before you. And you heard some testimony that with another individual there were some drugs found in the car.
>
> That evidence regarding the drugs should not have been admitted under the rules of evidence, in my opinion, and I ask you to disregard it. In general, the fact that someone's accused of the crime may have committed another crime is not to be allowed in as evidence that he committed the crime with which he's charged. So I ask you to disregard that piece of the evidence that was given to you.

(*Id*. at 764-65.)

Garcia-Ruiz argues the admission of this testimony was precluded by Rule 404(b) of the Federal Rules of Evidence[5] and its admission prejudiced him by allowing the jury to add specific amounts of cocaine to the quantity it considered in determining he conspired to distribute more than 5 kilograms of cocaine. We review the court's admission of evidence for an abuse of discretion. *United States v. Bradshaw*, 580 F.3d 1129, 1132 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 2371 (2010).

Assuming, without deciding, the court abused its discretion in admitting Prince's

---

[5] Federal Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

- 12 -

testimony, we find no prejudice. Garcia-Ruiz relies on our holding in *United States v. Warledo*, 557 F.2d 721, 726 (10th Cir. 1977). There, we held the admission of a gun unrelated to the charge of arson conspiracy was prejudicial despite the court's limiting instruction. *Id*. We concluded the court's instruction to consider the evidence solely for impeachment purposes was insufficient, since the evidence was not admissible to impeach the defendant. In addition, the court did not tell the jury the issue was collateral to the charges and it did not address the effect of the evidence on his co-conspirators. *Id*. This case is easily distinguished.

Unlike *Warledo*, the limiting instruction to the jury here removed consideration of this evidence for any purpose. The judge clearly told the jury Prince's testimony should not have been admitted. "We presume that jurors will follow clear instructions to disregard evidence unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *United States v. Lamy*, 521 F.3d 1257, 1266 (10th Cir. 2008) (quotations omitted). In this case, not only was the instruction clear, but there is no evidence the jury did not follow it. Moreover, the other evidence of the conspiracy's distribution of over 5 kilograms of cocaine during Garcia-Ruiz's involvement was substantial. The district court did not abuse its discretion in concluding the instruction cured any earlier error.

C.      Drug Quantity at Sentencing

Garcia-Ruiz challenges the procedural reasonableness of his sentence. He maintains the district court erred when it rejected his claims that the evidence was

insufficient to demonstrate the conspiracy distributed more than 150 kilograms of cocaine during his involvement. We review the district court's calculation of drug quantities at sentencing for clear error and "will reverse only if the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." *United States v. Ryan*, 236 F.3d 1268, 1273 (10th Cir. 2001). The government has the burden of proving the quantity of drugs for sentencing purposes by a preponderance of the evidence. *Id*.

The district court overruled Garcia-Ruiz's objection to the PSR's drug quantity calculation as follows:

> As the government has summarized, the evidence presented at trial covered a time period beyond the [sic] January 7, whatever the particular date was; and the evidence, although there was some conflict and you could certainly pick and choose perhaps what you wish to emphasize, but in general, that this was an ongoing, every-other week, significant amount of cocaine and cash being distributed and there's no question that a reasonable jury could conclude and a reasonable fact finder could conclude that this defendant was involved in a conspiracy that involved more than 150 kilograms of cocaine.

(R. Supp. Vol. 2 at 23.)

Garcia-Ruiz contends the government only proved, at best, he was involved in the distribution of 80-100 kilograms of cocaine. The government contends "the district court reasonably estimated the amount of cocaine attributable to Mr. Garcia-Ruiz to be over 150 kilograms of cocaine based on the testimony relating to the frequency of the shipments over the course of the conspiracy, the size of the shipments, and the length of Mr. Garcia-Ruiz's involvement in the conspiracy." (Government's Br. at 34.) Unfortunately the government offers no record support for its summary statement.

Viewing the evidence in the light most favorable to the government, we must agree with Garcia-Ruiz. Garcia-Ruiz was involved in the conspiracy from late October 2006 until his arrest in April 2007. During that time, the government presented evidence of four specific shipments: one in late October or early November 2006, one on November 28, 2006, one on December 13, 2006; and the shipment confiscated on January 8, 2007. Luis Camacho-Levario testified the quantity of drugs in the early November 2006 and the January 8, 2007 shipments were each close to 25 kilograms, totaling 50 kilograms. The runner who retrieved the December 13, 2006 shipment testified it was "about" 24 kilograms. (R. Vol. 2 at 469.) Giving the government the benefit of the doubt, another 25 kilograms would total 75. Luis testified, generally, the shipments were 25 to 30 kilograms "about every other week."[6] (Vol. 2 at 216.) Given that testimony, we will assume the November 28, 2006 shipment was 30 kilograms and will also assume an additional 30 kilogram shipment was made between the October/early November 2006 and November 28, 2006 shipments.[7] These assumptions add another 60 kilograms, totaling 135 kilograms. Luis said there were no further shipments from Mexico after the January shipment was confiscated and the government did not show the conspiracy received equivalent shipments from any source after January 2007. Thus, the quantity of cocaine from the Mexico shipments during Garcia-Ruiz's

---

[6] Although there was other testimony regarding the quantity of drugs, Luis's testimony was the most generous to the government. We defer to the district court when reviewing the credibility of witnesses on whose testimony the district court relies in making its drug quantity factual findings. *United States v. Nieto*, 60 F.3d 1464, 1469-70 (10th Cir. 1995).

[7] The remaining known shipments were approximately two weeks apart.

involvement from October 2006 through April 2007 was 135 kilograms.

The record clearly indicates the availability of cocaine after the January confiscation decreased dramatically.  But one of Alejandro Camacho-Levario's customers testified as to how Garcia-Ruiz assisted him in the purchase of one kilogram of cocaine on January 28, 2007.  And a diligent review of the taped telephone conversations beginning in November 2006 and continuing through April 25, 2007 – the day before the arrests – reveals Luis purchased and sold approximately a kilogram of cocaine in February.  Even if we were to credit the amount discovered during Garcia-Ruiz's traffic stop in February 2007 -- 226 grams – for the purpose of sentencing, Garcia-Ruiz was responsible for, at most, 137.226 kilograms of cocaine.

We recognize that "[w]hen the actual drugs underlying a drug quantity determination are not seized, the [sentencing] court may rely upon an estimate to establish the defendant's guideline offense level so long as the information relied upon has some basis of support in the facts of the particular case and bears sufficient indicia of reliability."  *United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005) (quotations omitted).  However, the government does not point to any basis in the facts which would allow the district court to reach an estimate that the conspiracy distributed over 150 kilograms during Garcia-Ruiz's participation.  The government relies solely on Luis's testimony that the conspiracy distributed a quantity of 25-30 kilograms every two weeks.  But, as explained above, that mallet cannot ring the bell given testimony of specific quantities in specific shipments.

Accordingly, we conclude the district court erred when it calculated this portion of

Garcia-Ruiz's base offense level. It should have begun with a base offense level of 36, *see* USSG § 2D1.1(c)(2) (at least 50 kilograms but less than 150 kilograms of cocaine), rather than beginning its calculations with a base offense of 38. *See* USSG § 2D1.1(c)(1) (trafficking 150 kilograms or more of cocaine). Any error in the guidelines calculation requires a remand unless the error is harmless. *United States v. Kristl*, 437 F.3d 1050, 1054-55 (10th Cir. 2006). A harmless error is one which we can say "did not affect the sentence selected." *United States v. Tom*, 494 F.3d 1277, 1282 (10th Cir. 2007). It is the government's burden to convince us by a preponderance of the evidence the error is harmless. *United States v. Conlan*, 500 F.3d 1167, 1170 (10th Cir. 2007).

A district court must begin every sentencing proceeding by correctly calculating the applicable Guidelines range." *United States v. Scott*, 529 F.3d 1290, 1300 (10th Cir. 2008) (quotations omitted). "A sentence cannot . . . be considered reasonable if the manner in which it was determined was unreasonable, i.e., if it was based on an improper determination of the applicable Guidelines range." *Tom*, 494 F.3d at 1282 (quoting *Kristl*, 437 F.3d at 1055). If the district court had applied a base offense level of 36, Garcia-Ruiz's guideline range would have been 292 to 365 months imprisonment rather than the 360 month to life.

The government argues "the question of what the applicable base offense level should have been is largely academic because Mr. Garcia-Ruiz received a much lower sentence than he would have received even if the drug quantity evidence had only supported a base offense level of 36, as opposed to 38." (Government Br. at 34.) It contends because "the district court's variance was tied to the average sentences that

were recommended by the Government for the leaders of the drug organization . . . 180 months," there is no "assurance" Garcia-Ruiz's sentence would be lower on remand. (*Id*. at 36.) While this argument has obvious weight, it cannot carry the day.

At the time of sentencing, the court thought Garcia-Ruiz, like the "kingpins," was responsible for the distribution of over 150 kilograms of cocaine. It was faced with a difficult situation and wanted to "measure that in a fair way and come up with a sentence that is sufficient but not greater than necessary." (R. Supp. Vol. 2 at 26.) It recognized the disparity between the actions of the different conspirators as compared to those of Garcia-Ruiz (several years of distributing well over 150 kilograms of cocaine and Garcia–Ruiz's active involvement for no more than four months) as well as the proposed sentences for others who had been significantly involved for a substantial period of time (sentences ranging from 47 months for another runner in a position similar to Garcia-Ruiz's up to 194 months for Jose Muñoz, the main partner with Alejandro in the Camacho Group.)

We recognize these other defendants pled guilty prior to trial,[8] but we cannot know what the court would do in dealing with a correct drug amount. Therefore, the error in calculation cannot be said to be harmless in this instance and we remand for resentencing. It may be that the already lenient sentence would not change because the amount of drugs was 130+ kilograms rather than 150. But that is a decision for the trial

---

[8] We note some of these defendants' agreements with the government occurred less than one week before trial, thereby causing the government significant work over a three-year time span.

judge, not this Court.

We wish to emphasize that we do not hold nor are we asked to determine whether Garcia-Ruiz's sentence is *substantively unreasonable.* Clearly, it is not. But the unique circumstances of this case do not allow us assume the district court would impose the same sentence on remand.

D.      Firearm Enhancement

Garcia-Ruiz also claims procedural error at sentencing when the district court added, over his objection, two levels to his base offense level pursuant to USSG § 2D1.1(b)(1) for the firearm found in his apartment. Because the firearm was discovered at the time of his arrest, April 26, 2007, and the conspiracy was no longer distributing drugs, he maintains the government failed to prove a spatial or temporal connection with the gun and a drug transaction.

The district court stated:

> The weapon issue is more difficult for me, but I would I think have to overrule the objection. The evidence presented no situation where the gun was connected with the defendant in an actual transaction. Yet again, as the government points out, one could reasonably conclude that the -- there was a sufficient relationship between the defendant's significant drug activity and the presence of a gun at a location where he was seen to come and go under surveillance and otherwise involving drug transactions so that that objection likewise is overruled.

(R. Supp. Vol. 2 at 24.) The district court's findings of fact concerning the application of a two-level increase under USSG §2D1.1(b)(1) are reviewed for clear error. *United States v. Robinson*, 978 F.2d 1554, 1568 (10th Cir. 1992).

USSG §2D1.1(b)(1) provides: "If a dangerous weapon (including a firearm) was

possessed, increase by 2 levels." "The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG §2D1.1(b)(1), comment, n.3 (2009). "Weapon possession is established if the government proves by a preponderance of the evidence that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." *United States v. Roederer*, 11 F.3d 973, 982 (10th Cir. 1993) (quotations omitted). "Generally, the government must provide evidence that the weapon was found in the same location where drugs or drug paraphernalia are stored or where part of the transaction occurred." *Id*. at 983 (quotations omitted). "Once the government has satisfied its initial burden, the burden shifts to the defendant to show that it is clearly improbable the weapon was connected with the offense." *United States v. Pompey*, 264 F.3d 1176, 1181 (10th Cir. 2001).

The evidence demonstrated Garcia-Ruiz occasionally used his apartment to store smaller quantities of cocaine and proceeds from drug transactions. There is evidence he did so until as late as January 18, 2007. The telephone wiretaps also established the ongoing nature of the conspiracy through the date of Garcia-Ruiz's arrest and the seizure of the gun, April 26, 2007. However, no evidence of drugs, drug paraphernalia or proceeds were found at Garcia-Ruiz's apartment on that date. Garcia-Ruiz argues because there was no evidence he was observed carrying a firearm while acting as a runner for the Camacho brothers, no evidence that he was overheard talking about a firearm on any of the intercepted phone calls, and no evidence the firearm was in the

residence he shared with his wife prior to April 26, 2007, the government failed to prove, by a preponderance of the evidence, the necessary temporal relationship between the weapon, the drug trafficking activity, and the defendant. We disagree.

Under USSG §1B1.3(a)(1), the application of a specific offense characteristic such as §]2D1.1( b)( 1), requires the court to consider "all acts and omissions committed, aided [or] abetted . . . that occurred during the commission of the offense of conviction . . . ." Here, the government proved the gun was in the apartment, Garcia-Ruiz knew it was there, he had used the apartment to further the conspiracy to traffic cocaine (the offense of conviction) and, at the time the gun was discovered, he was a member of the conspiracy. Therefore, the government sufficiently proved the enhancement applied. *See United States v. Martinez*, 77 Fed. App'x 490, 500 (10th Cir. 2003)[9] (fact that gun possessed during conspiracy sufficient even though no evidence showing defendant "carried, brandished, loaned, accessed, or held the weapon during any drug transaction or that the weapon was present or nearby"). Garcia-Ruiz argued only that the enhancement did not apply. He made no argument that it was clearly improbable the weapon was connected with the offense. The district court's application of the firearm enhancement was not clearly erroneous.

---

[9] Unpublished opinions are not binding precedent. 10th Cir. R. App. P. 32.1(A). We mention *Martinez* as we would an opinion from another circuit, persuasive because of its reasoned analysis.

Garcia-Ruiz's conviction is AFFIRMED. We REVERSE as to the applicable drug quantity for sentencing purposes and REMAND for resentencing.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge